**Uberto CORTI, Plaintiff,**

v.

**CONTINENTAL COPPER AND STEEL EXPORT CORPORATION,**
**Defendant.**

United States District Court
S. D. New York.
July 17, 1963.

Groban & Rava, New York City, for plaintiff; Robert S. Groban, New York City, of counsel.

Gordon, Brady, Caffrey & Keller, New York City, for defendant; Leroy C. Curtis, New York City, of counsel.

McLEAN, District Judge.

This is an action for alleged breach of a contract relating to a prospective business enterprise in Italy. Plaintiff is an Italian citizen. Defendant is a Delaware corporation. Jurisdiction rests on diversity of citizenship.

The complaint alleges that the contract consists of a letter dated February 5, 1958 signed in New York by defendant but not signed by plaintiff. Plaintiff contends, however, that the terms of the contract are not all expressly set forth in this letter, and that some of them are to be implied from the prior dealings between the parties. Plaintiff's position

is that one must read the letter in the light of these prior dealings in order to ascertain its complete significance.

Defendant's contentions are (1) that there was no contract, both because defendant made no promise and because the terms of the arrangement were too indefinite; (2) the existence of a contract, or at least of any liability on the part of defendant, was subject to the happening of a condition precedent which in fact never occurred; (3) in any case, plaintiff did not perform. Defendant also pleads the New York Statute of Frauds, on the theory that the contract, if any, could not be performed within one year.

There is no serious dispute about the facts, which I find to be as follows:

In 1957 Continental Copper & Steel Industries Inc. ("Industries"), a Delaware corporation, was engaged in manufacturing various products, one of which was earth moving equipment manufactured by its Wooldridge Division. Continental Copper & Steel Export Corporation ("Export"), the defendant here, was also a Delaware corporation. Seventy-five per cent of its stock was owned by Industries and the remaining 25 per cent by Z. Bronsky, executive vice president of Export. Mortimer Gordon was president of both corporations.

Although a separate corporation, Export seems to have been operated pretty much as a division of its parent company, handling matters having to do with foreign operations. As an illustration of this, the only corporate action taken with respect to this transaction, as far as appears, was taken by the board of directors of Industries, and the cost estimates and other data for the project were prepared by Industries which, as previously stated, was the corporation which manufactured the equipment.

In 1957 Industries was considering the possibility of organizing a company, jointly with foreign "partners," if appropriate ones could be found, to manufacture earth moving equipment, under a license from Industries, in some European country within the Common Market. Bronsky had met plaintiff, a citizen and resident of Italy, who had a wide acquaintance among persons prominent in financial and governmental circles in that country. Prior to October 1957, Bronsky had told plaintiff of defendant's interest in such a project.

In early November of that year, Gordon and Bronsky met with plaintiff in Paris. Plaintiff suggested that a factory be built in southern Italy which could take advantage of the liberal financing that the Italian government provided for industrial projects in that area. Gordon said that it would cost roughly $2,500,000 to build the plant, and that an additional $1,000,000 of working capital would be necessary. Plaintiff expressed the view that it would not be difficult to raise this sum, partly from government loans and partly from Italian investors. Plaintiff prepared and delivered to Gordon and Bronsky a memorandum on the subject, in which he stated:

"We will create the Italian group and we will associate the same with Wooldridge for a maximum percentage of 50% if the Italian laws will admit it; otherwise the percentage owned by Wooldridge will be the maximum allowed by law."

Gordon said in substance that he would be glad to have plaintiff communicate further with Bronsky about this proposal. He took occasion to point out, however, that Bronsky had no authority to make any final commitment on behalf of defendant.[1] Gordon also stressed that it was important that any such project be started quickly so that defendant could obtain an initial advantage in the Common Market.

Plaintiff then returned to Italy in order, as he testified, "to find out somebody who could help us in this deal." He went to see Cicogna, vice president

---

1. Bronsky did not testify at the trial, being then a resident of Argentina and no longer employed by defendant, but a clear picture of his activities can be obtained from his memoranda and correspondence which were put in evidence.

of an investment company in Milan referred to for brevity's sake as Sviluppo. On November 13, 1957, plaintiff cabled defendant:

"Italian group being interested and only your approval being needed for speedy conclusion. Please convey President Gordon certitude that deal will be settled by early December."

On November 22 Bronsky wrote to plaintiff expressing defendant's "deep interest" in the project, but pointing out that since defendant had other proposals from people in other countries, it was necessary "to come to a determination in this matter in a reasonably short time."

In December 1957 Bronsky went to Italy. On December 11 he was introduced by plaintiff and plaintiff's lawyer Sartorelli to Minister Campilli, the head of an Italian government lending agency known as the Mezzogiorno, and to Prof. Ventriglia, the head of a division of that agency, known as Isveimer, which had charge of projects in southern Italy. Bronsky and plaintiff outlined their idea in general terms. Bronsky explained to the Minister that he was in contact with Sviluppo who had expressed interest in participating in the project. The choice of sites for the manufacturing plant was discussed and the Minister was informed that the site would either be near Naples or near Bari in southern continental Italy. The minister expressed a perference for Bari.

Bronsky felt that he had received a friendly reception. The Minister did ask, however, for "complete documentation with plans, tenders, estimates, etc."

Thereafter Bronsky went to Milan to meet Cicogna who assured Bronsky that Sviluppo would be willing to consider a 50 per cent participation in the project as soon as defendant "submitted a concrete proposition." Bronsky then returned to New York. Plaintiff stayed in Italy and on December 24, 1957 advised Bronsky by cable that the situation was very favorable "provided we reach quick decision," and that the "deal should be closed by end of February." It is un-

disputed that Sviluppo was the only group with which plaintiff and Bronsky were negotiating as possible participants in the enterprise.

In early January 1958, Industries prepared in some detail a memorandum including estimates of the amount of working capital required for the project, cost of producing machines, cash required for the first year of operations, drawings of the proposed plant, estimated cost of erection and equipment of the plant and similar information.

On January 23, 1958 the board of directors of Industries adopted a resolution providing that Gordon, as president of the company, be authorized "to negotiate the Italian deal on the best possible terms" provided that "the Company's investment shall be limited to $250,000 in Wooldridge equipment * * * and $150,000 in cash."

At the end of January, plaintiff arrived in New York. He examined the estimates and discussed the project at some length with Bronsky and Gordon. On February 3, plaintiff and Bronsky prepared and sent off a letter to Sartorelli, enclosing copies of the memorandum of estimates and a letter signed by Bronsky addressed to Minister Campilli of the Mezzogiorno. Sartorelli was requested to deliver these enclosures to the Minister. Sartorelli cabled Bronsky that he had done so on February 8.

The letter to the Minister referred to the meeting which Bronsky and plaintiff had had with him in December and stated that "in association with our Italian colleagues and upon terms, participations and conditions mutually satisfactory, we are prepared to participate in the formation of an Italian Company having a paid-in capital of $1,350,000." The letter further stated that "We have given our Italian colleagues all necessary information which we believe will enable them to complete the application form addressed to Isveimer." The letter concluded by bespeaking favorable consideration of the application when it should be filed.

On the same day, February 3, plaintiff and Bronsky prepared a letter signed by

Bronsky addressed to Cicogna stating that the board of directors of Industries "has definitely approved the project of establishing an industry in Southern Italy" for the manufacture of Wooldridge earthmoving equipment and that "this project is now subject to the agreement of your group and of the Ministry of Mezzogiorno * * *." A copy of the memorandum of cost estimates was enclosed.

On February 5, 1958, plaintiff had a further discussion with Gordon and Bronsky in the course of which plaintiff said that he would like a letter outlining "what his position in the deal would be." After further discussion, the letter dated February 5 which is the basis of this action was prepared and signed by Bronsky. There is some question as to whether Gordon personally dictated it or not, but there is no doubt that if he did not, he approved its contents. This letter is of such importance that despite its length, it seems desirable to set it forth in full.

"CONTINENTAL COPPER &
STEEL EXPORT
CORPORATION
"120 Broadway—New York 5, N.Y.
"Telephone Worth 2–6000
"February 5, 1958

"Count Uberto Corti
"Via Gregoriana 5
"Rome, Italy.

"Dear Count Corti:

"This letter will confirm our conversation of today.

"Since having had the pleasure of meeting with you in Paris, I believe that you will agree that our Company has done everything that I indicated to you that we were willing to do. We have not only done the necessary preliminary engineering financial forecasts, but we have secured from our Board of Directors the necessary authority to proceed.

"As our preliminary data indicates, we believe that approximately $2,500,000 will be required to build the type of plant which in our opinion is necessary and that $1,000,000 of working capital will be adequate for the immediate and reasonable foreseeable future needs, which shall be provided as follows:

"(a) Governmental loan $1,750,-
000;

"(b) A paid in capital in the Italian corporation of $1,350,000;
"(c) A long term loan from a local Italian bank of approximately $400,000 at interest not exceeding 8% per annum.

"Upon organization of the corporation we are to have validly issued to us as fully paid and non-assessable, one half of the stock of the corporation and we are (a) to furnish Wooldridge equipment at our wholesale list price, f. o. b. plant, Sunnyvale, California in the sum of $250,000; (b) to furnish know how for which we are being credited in the sum of $100,000; and (c) to pay in, pursuant to a general call upon all stockholders an additional $150,-000; our Italian colleagues similarly are to have validly issued to them as fully paid and non-assessable, the other half of the stock of the corporation and they are (a) to pay in immediately $350,000; (b) to secure reductions in estimated cost of construction of not less than $350,000 or in the alternative pay in $350,000 as capital of the corporation; and (c) to pay in, pursuant to a general call upon all stockholders an additional $150,000.

"We shall grant to the new Italian corporation to be formed a ten-year exclusive license for the manufacture and sale of all type Wooldridge Equipment in all of Europe, including Yugoslavia, but excluding other Iron Curtain countries, Near and Middle East and also Belgium Congo and countries forming the French Union, carrying with said exclusive license a 5% royalty, and upon the usual terms and conditions in such arrangements.

"We understand that you will arrange for suitable governmental guarantees to assure adequate protection of the local market for the new organization.

"Our Mr. Bronsky estimates that the Italian Company, through the good offices of the sales organization which we will organize and finance, should sell a minimum of $1,500,000 wholesale list price of merchandise between the time of the inception of the program and the beginning of manufacture in Italy. Should such be accomplished, the new corporation would have additional profit available for capital purposes the extent of which, of course, cannot be indicated with finality at this time.

"We believe that a budget of $100,000 which we will provide should be ample to defray expenses of this new sales organization.

"We anticipate that coincidentally with the granting of the franchise and conclusion of other details, that a contract will be entered into between the sales organization and the Italian manufacturing company, giving the sales organization exclusive sales rights and providing for payment by the manufacturing company to the sales company of commissions of 28% in full payment of all sales company and dealers' sales commissions and charges.

"We understand that you desire the new manufacturing company to pay you $50,000 in cash for services rendered by you and that the sales company should pay to you 13 months after consummation of the proposed transaction, an additional sum of $50,000 conditioned upon a similar sum being paid to you by the Italian colleagues and that you should have the option to receive from the sales company in lieu of $50,000, $25,000 in cash and 20% of its capital stock. We wish to advise you that as proposed stockholders of both corporations we

would raise no objection to these payments being made to you.

"We are very desirous that this business be formalized as close to February 15 as is possible. We are planning to start shipping the equipment to be contributed as capital prior to March 1, 1958 and we understand that it is your desire that the full amount of equipment be shipped, freight and shipping to be paid by our new company, rather than a lesser amount of equipment plus our contribution of freight and other expenses.

"I trust that the foregoing completely sets forth the general outline of the matters which we have discussed.

"Sincerely yours,
"(Signed) Z. BRONSKY
"Z. BRONSKY
"Executive Vice President
ZB:SC"

Plaintiff thereupon returned to Italy to continue negotiations with Sviluppo which, as we have seen, had not up to that date made any commitment to participate in the venture. Thereafter plaintiff sent to Bronsky a series of optimistic cables expressing the view in substance that Sviluppo's attitude was very favorable. Nevertheless, the meeting of Sviluppo's directors, called in February to consider the project, was postponed to March 7 and finally on March 9 plaintiff advised Bronsky that Sviluppo had decided not to participate. This decision was subsequently confirmed by Cicogna in a direct cable to Bronsky.

Pending receipt of Sviluppo's decision, nothing had been done about forming the Italian corporation and no formal application for a loan had been filed with the Mezzogiorno. As it turned out, the corporation was never formed and no such application was ever filed.

In April 1958, Bronsky went to Rome. While there he interviewed three different groups whom he thought might be interested in making an investment in

the project. Only one of the three was introduced to him by plaintiff. At one point Bronsky suggested to Gordon that perhaps Industries might itself submit a loan application to Isveimer, without waiting to form a corporation or secure an Italian partner. Gordon definitely vetoed this suggestion, however, stating in his letter to Bronsky of April 8 that "we should not move in this matter at all until such time as a complete deal is worked out and is definitive."

On April 30 Bronsky wrote to Gordon recommending that defendant enter into an agreement with a group called Finmeccanicca, who Bronsky thought would be willing to participate. This was one of the three groups with whom he had been talking, and was not the one to whom he had been introduced by plaintiff. Gordon made no reply to this recommendation, as far as appears, and nothing came of the proposal.

The people whom plaintiff had contacted after the unsuccessful termination of the negotiations with Sviluppo were two individuals in Rome, Sforza Ruspoli and his brother-in-law Franco Lanza di Scalea. They were interested in seeing the factory built in Sicily, not in southern continental Italy. Apparently at their suggestion Bronsky went to Sicily to look at the locality and after his return reported to Gordon on April 30 that he thought that Palermo, which Ruspoli and di Scalea favored, would be unsatisfactory, although he considered Catania to have possibilities. This is the same letter in which Bronsky recommended that defendant enter into an agreement with Finmeccanicca.

On May 3, 1958, Bronsky's last day in Rome, he and plaintiff met with Ruspoli and di Scalea. They showed Bronsky a letter which they had drafted and discussed it with him to some extent. Bronsky had to leave before the letter was ready, but plaintiff forwarded it to Bronsky in Paris later that day. The letter was signed by plaintiff and by Ruspoli and di Scalea, addressed to Industries. It stated that the writers would "form a society" to build a factory in Sicily to man-

ufacture Wooldridge earth moving equipment with an initial capital of 1,000,000 Lire (about $1,700) which would be subsequently increased to "provide in cash, on the part of the shareholders at least 1,000,000 Dollars"; that one-half of the capital of the society would be transferred to Industries; that the other 50 per cent of the capital would be contributed "in part" by Ruspoli and di Scalea and "in part by the intervention of" the Sicilian Financing Society, a regional organization "created in support of the Sicilian industrial enterprise." The letter went on to say that the company would "hasten the intervention of" an institution known as IRFIS (apparently the Sicilian branch of the Mezzogiorno), "equal to 65% of the cost of the installations as well as the other Sicilian facilities." Ruspoli and di Scalea testified by deposition that they intended this letter to mean that each of them would contribute one-third of 50 per cent of the capital of the corporation.

Bronsky wrote to plaintiff from Paris on May 6 stating that he was sending this letter to Gordon and that he would get in touch with plaintiff "as soon as I shall get an answer."

No answer was forthcoming. On June 6, 1958, Bronsky wrote plaintiff saying that he had sold his stock in Export and was no longer connected with it except as a consultant. Gordon testified that in late May or early June plaintiff telephoned him to inquire how matters stood and that Gordon told plaintiff that defendant was no longer interested in discussing business with him.

On June 17, 1958, Industries entered into a contract to sell its Wooldridge Division to Curtiss-Wright Corporation. The contract provided that Industries would not engage in the business of manufacturing earth moving equipment between July 1, 1958 and June 30, 1965. This contract was duly carried out. In January 1959, pursuant to a resolution of the board of directors and stockholders adopted on December 31, 1958, Export was dissolved.

The first question to which these facts give rise is whether there was an enforceable contract between the parties. The letter of February 5, 1958 was signed only by defendant. If we look solely to that letter, there was no undertaking by plaintiff and no consideration for whatever promise defendant made. But it is clear that under the law of New York, where the alleged contract was made, the existence of an oral promise by plaintiff may be shown to supply the consideration which the writing itself does not contain. Ruegg v. Fairfield Securities Corp., 308 N.Y. 313, 125 N.E.2d 585 (1955).

When we look to the course of dealing which preceded the February 5 letter, in the light of which that letter, incomplete on its face, should be read, it is apparent that plaintiff in fact did undertake certain obligations. It can be fairly concluded from the evidence that plaintiff agreed to use his best efforts to procure the consent of Sviluppo to invest in stock of the proposed manufacturing corporation, to procure a loan of $400,000, either from Sviluppo or from an Italian commercial bank, and to procure a loan of $1,750,000 from the Mezzogiorno. Plaintiff stresses that these negotiations were to be carried on by him jointly with defendant, since he alone did not possess the necessary information as to defendant's activities. No doubt this is true, but nevertheless a bona fide effort on plaintiff's part was required, and he undertook to make that effort.

Defendant contends that it made no promise at all to plaintiff. This is not borne out by the letter of February 5. In that letter defendant expressly agreed to furnish part of the capital of the new manufacturing corporation, to grant it a license to manufacture Wooldridge equipment and to organize and finance a sales company to sell the product of the manufacturing corporation. With respect to compensation for plaintiff, defendant expressly agreed that as a stockholder of the proposed manufacturing and sales corporation, it would consent to the payment by those corporations to plaintiff of the compensation in cash or in stock specified in the letter, provided that "the Italian colleagues" were willing to pay plaintiff an additional $50,000.

Defendant also urges that the arrangement was too incomplete and too indefinite to constitute a binding contract. Defendant relies on a line of cases of which St. Regis Paper Co. v. Rayward, 16 A.D.2d 130, 225 N.Y.S.2d 871 (1st Dept. 1962), aff'd, 12 N.Y.2d 1033, 239 N.Y.S.2d 551, 189 N.E.2d 815 (1963), is a good example. These are cases in which the courts have held that no contract existed because the parties' minds never met on essential terms or because the language that they used was too imprecise to amount to a commitment. Defendant points to the fact that as of February 5, 1958, many matters had not been determined which would necessarily have to be decided if this project was ultimately to go through. Examples are the exact corporate structure of the proposed corporations, the identity of their officers and directors, the terms of the proposed loans, and the terms of the proposed license agreement.

The St. Regis Paper Co. case and similar cases do not seem to me to fit this situation. We do not have here a case in which rights and obligations of the plaintiff remain to be defined. The matters which were unresolved as of February 5 were not left to future agreement between defendant and plaintiff, but rather to agreement between defendant and its "Italian colleagues." If the Italian group agreed to become a 50 per cent stockholder of the new manufacturing corporation, its consent, or the consent of its representatives on the board of directors of the manufacturing corporation, would be required to determine them.

▪ It must be borne in mind that defendant did not promise itself to pay compensation to plaintiff. It promised to vote its stock in the new corporations in favor of payment to plaintiff by those corporations. The fulfillment of this promise necessarily presupposed the formation of the corporations and the ac-

quiesence of the other 50 per cent stockholder. If the Italian group had agreed to participate and had agreed to vote its stock in favor of the payments to plaintiff, and had agreed to pay him the additional $50,000, any failure thereafter by defendant to live up to its promise would have given rise to a cause of action in favor of plaintiff, if not for specific performance, at least for damages. A contract may be too indefinite to justify a decree for specific performance and yet definite enough to sustain an action for damages. Gulbenkian v. Gulbenkian, 147 F.2d 173, 158 A.L.R. 990 (2d Cir. 1945).

If, on the other hand, the Italians had not participated in the corporation, or having agreed to participate, had not agreed to vote in favor of the payment to plaintiff, then plaintiff would have had no cause of action, not because defendant's promise was too indefinite, but because the conditions under which that promise was to become effective, according to the letter of February 5, had never been fulfilled.

It follows that, although defendant's claim of indefiniteness is without merit, its further contention as to the existence of conditions precedent is well founded. It is not necessary to go as far as to say that the very existence of a contract was subject to the occurrence of a condition precedent. In my view, there was a contract, as of February 5, 1958, between plaintiff and defendant, but one of the terms of that contract was that a condition precedent to the existence of any liability thereunder on the part of defendant was the participation and consent of the "Italian colleagues." The nub of the question, therefore, at least in the first instance, is to whom did the parties refer by this phrase? The conclusion is inescapable that they referred to Sviluppo, and only to Sviluppo. This is the only Italian group with which plaintiff and defendant had dealt at any time between November 1957 and February 1958. All the evidence indicates that this was the only prospective participant that they then had in mind. There is no discernible reason why the letter of February 5 should not have referred to Sviluppo by name. Its failure to do so must be ascribed to Bronsky's rather grandiloquent literary style.

It is also clear that one of the terms of the contract was that the participation of Sviluppo was to be procured promptly. The letter expressly says that the business should be "formalized as close to February 15 as is possible." The previous conversations and correspondence between the parties were to the same effect. As the letter says, defendant wanted to start shipping the initial equipment by March 1.

Sviluppo had not made up its mind by March 1. We need not speculate as to what the result would have been if it had subsequently agreed, for on March 9 it definitely announced that it would not participate at all. As of that moment it became obvious that the condition precedent had not been and would not be fulfilled. It is not a question of any failure on the part of plaintiff to perform. It may be assumed that he had done his best to procure Sviluppo's participation, and that he was as chagrined as defendant was at this turn of events. Nevertheless, Sviluppo would not join the venture, the project could not possibly be completed by March 1, and plaintiff, therefore, was not in a position to secure any compensation for the work which he had theretofore done. See Hicks v. Bush, 10 N.Y.2d 488, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962); Ivor B. Clark Inc. v. Boston Road Shopping Center, 24 Misc.2d 84, 207 N.Y.S.2d 582 (N.Y.Co. 1960).

If at that point defendant had advised plaintiff that in view of Sviluppo's decision, it no longer desired to organize an Italian subsidiary, there would be nothing more to be said. But defendant did not take such a clear-cut position. Instead, it sent Bronsky to Rome to investigate other possibilities. Bronsky talked to several prospective investors, but he continued to talk to plaintiff, and he conferred with Ruspoli and di Scalea to whom plaintiff introduced him. Plain-

tiff could reasonably have assumed that time was no longer as important to defendant as it had been originally. As far as plaintiff was informed, defendant was still looking, at least as late as May 3, 1958, for a suitable Italian "partner" with whom to consummate the project. It is understandable, therefore, that plaintiff should feel aggrieved when he discovered, in late May or early June, that defendant and its parent Industries had abandoned the project and had indeed incapacitated themselves from carrying it out by disposing of the Wooldridge division and agreeing to go out of the business of manufacturing earth moving equipment.

Although it would appear from the evidence that defendant was rather inconsiderate in this treatment of plaintiff, the fact remains that the only issue before me is whether defendant was legally entitled to do what it did, without subjecting itself to liability to plaintiff for damages. I conclude that it was. The contract of February 5 between plaintiff and defendant came to an end on March 9 when Sviluppo decided against participation. Everything that plaintiff did thereafter was done in an effort to induce defendant to accept something different from what it had been originally willing to accept. Defendant was not legally bound to build a factory in Sicily rather than in Southern Italy. It was not bound to accept as "Italian colleagues," in lieu of the Milan investment banking house of Sviluppo, two individuals about whom it knew little or nothing, and as to whose financial responsibility there might well be some question.[2] Defendant was not bound to accept as a third stockholder a Sicilian financial society with which it had never dealt and which, in any event, as far as appears, never agreed to participate. And finally, defendant was not bound to seek from a lending institution known as IRFIS a 65 per cent loan in lieu of the 70 per cent loan from the Mezzogiorno which the contract of February 5 contemplated.

Even plaintiff does not claim that Bronsky agreed to these things, and it is apparent from the correspondence, and I so find, that he did not. He merely advised plaintiff that he would transmit this proposal to Gordon for his consideration. Plaintiff had known from the outset that Bronsky had no authority to bind defendant by any commitment. Gordon was not obligated to accept this proposal, for it was an entirely new offer, not a performance of the contract of February 5.

In view of the fact that plaintiff's efforts came to nothing, and that no Italian corporations were ever formed, plaintiff is also faced by uncertainties as to damages which would seem, under the circumstances, to be speculative. It is unnecessary to consider that question, however, and there is likewise no need to pass upon defendant's defense of the Statute of Frauds. I hold that plaintiff has failed to prove a cause of action for breach of contract and that accordingly, his complaint must be dismissed.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

The Clerk is directed to enter judgment in favor of defendant in accordance with this opinion. So ordered.

---

2. In their depositions, both Ruspoli and di Scalea refused to answer questions on cross-examination as to their financial resources, taking the position that this was their own private affair.