MID–CONTINENT TELEPHONE COR-
PORATION, Plaintiff,

v.

HOME TELEPHONE COMPANY, Lon J.
Darley, Rex B. Darley, and Union Tele-
phone Company of Mississippi, Inc.,
Defendants.

No. DC 6924.

United States District Court,
N. D. Mississippi,
Delta Division.

Sept. 28, 1970.

George H. Butler, Lawrence J. Franck, Jackson, Miss., Edward F. Whipps, Columbus, Ohio, for plaintiff.

Robert H. Weaver, John Stennis, Jr., Jackson, Miss., Charles H. Ryan, Monroe, La., for Home Telephone Co., and Union Telephone Co.

Ross L. Franks, Hernando, Miss., for the Darleys.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Following a determination of plaintiff's right to maintain this action,[1] a full evidentiary hearing was conducted before the court without a jury. After submission of memorandum briefs, the case is now ripe for decision upon its merits.

Plaintiff, Mid-Continent Telephone Corporation (Mid-Continent), is an Ohio corporation that is the parent of a large independent telephone company system. This system, in addition to the plaintiff, consists of a group of approximately 35 operating subsidiaries providing telephone and communication service in 11 states. Defendant, Home Telephone Company (Home), is a Mississippi corporation, which was incorporated in 1947. Prior to its incorporation, Home had been operated as the sole proprietorship of Lon Darley. Home was a family-held corporation, having 2000 shares of outstanding common stock owned by the Lon Darley family as follows: Lon Darley 1490 shares; Rex Darley, a son of Lon Darley, 360 shares; Lon Darley, Jr., Howard Darley, also sons of Lon Darley, and Ben Mitchell, stepson of Lon Darley, 50 shares each. Home also had issued and outstanding 398 shares of 5% preferred stock of $10 par value which was held by 43 individuals.[2]

The defendant, Union Telephone Company (Union), became incorporated under Mississippi law on March 21, 1969, and its president is Clarke Williams, who is also president of Central Telephone and Electronics, Inc. (CT&E), the parent company and owner of all of the outstanding stock of Union.

Lon Darley and his son, Rex Darley, who owned over 90% of Home's common stock, controlled and directed the affairs of the company, and Lon Darley alone made all of the important management decisions. Home's officers consisted of Lon and Rex Darley and their wives, and its directors were persons selected and named by Lon Darley. The stockholders and board of directors of Home held only irregular meetings; the action taken at such meetings was ordinarily dictated by Lon Darley. The business operations of Home consisted of rendering exclusive telephone service to a portion of northern Mississippi adjacent to Shelby County, Tennessee. In the late 1950's and 1960's a portion of this service area experienced a very rapid growth in both residential and commercial population. This necessitated recurring expansion of telephone facilities, for which Home encountered difficulty in financing after REA largely withdrew from the field. As early as 1965 Lon Darley, having explored the problems likely to be encountered in additional capital financing, began to consider the possibility of a sale of Home to a larger telephone company. In May 1967, Lon Darley advised his stepson, Ben Mitchell of New York City, who was experienced in stock market and financial matters, of his interest in merging with a major telephone company in exchange for stock that would provide adequate income. Mitchell communicated this information to New York stock brokers who advised Weldon Case, president of Mid-Continent, that Home might be interested in selling its business to Mid-Continent.

In due course, Norman Weston, Mid-Continent's vice-president, contacted Lon

1. Mid-Continent Telephone Corp. v. Home Telephone Co., D.C., 307 F.Supp. 1014 (1969).

2. Home's corporate charter as amended authorized the issuance of 1,000 shares of preferred stock with a par value of $10 per share. While all of the preferred stock which was actually issued was denominated as "non-voting except as required by § 194 of the Constitution of 1890", the charter was subsequently amended to eliminate the reference to non-voting.

Darley with a view to Mid-Continent's acquisition of Home. Negotiations by correspondence and personal meetings took place over an extended period of time beginning in July 1967 and continuing through the fall months of 1968. The Darleys investigated Mid-Continent and discussed with various bankers and stock brokers the prospect of a sale of Home in exchange for Mid-Continent's common stock. The Darleys were particularly impressed with Mid-Continent's financial resources, its practice of promoting a measure of autonomy through local directors and officers in an acquired company, its reputation for providing adequate customer service, and its policy for having good employee relations, including a satisfactory employees' retirement program. Lon Darley was not interested in a cash sale but wanted to effectuate a tax-free stock exchange. He so advised Weston at the outset, and they began to negotiate on the basis of Home's common stockholders receiving Mid-Continent stock in lieu of cash. Tax-free acquisitions were common in the independent telephone industry, a fact of which the Darleys were well aware. Mid-Continent had successfully concluded 22 acquisitions with independent telephone companies, the great majority of which involved a tax-free stock exchange.

Weston advised Lon and Rex Darley that for the exchange to be tax-free, Mid-Continent and Home would have to obtain a favorable ruling from Internal Revenue Service and it would become necessary to submit to IRS a plan of corporate reorganization of Home. Weston stated that this plan of reorganization would have to be worked out between the attorneys for Mid-Continent and the attorneys for Home, and from Mid-Continent's experience in similar acquisitions IRS approval could be expected within 120 days after submission of the plan. Weston and the Darleys briefly discussed the outstanding preferred stock and concluded it did not present a problem to the exchange because of the small number of shares outstanding.

The approval of state and federal regulatory bodies was also discussed as a condition for merger, but these and other steps could be completed by the time IRS approval was obtained and the merger with stock exchange might then be completed without any delay.

At no time in these preliminary discussions was it mentioned that the Mid-Continent stock to be distributed would be stock registered with the Securities and Exchange Commission. In fact, such registration, which is a lengthy and expensive procedure, was outside the contemplation of the parties. The usual and customary procedure in tax-free transactions was for the acquiring corporation to issue unregistered stock as a "private placement" exempt from registration requirements. However, Weston specifically advised that the Darleys would acquire Mid-Continent stock listed on the New York Stock Exchange where it was daily traded, but Lon and Rex Darley would be required by law to sign a letter indicating an intent to hold their shares for investment purposes, and not for distribution, for a certain length of time and, since he was not an expert on such matters, they, the Darleys, should consult their own attorney or tax advisor as to what restrictions might exist in case of the Darleys' sale of Mid-Continent stock. No exceptions were taken or questions raised by either Lon Darley or Rex Darley as to these matters, nor did they immediately seek professional advice. Lon Darley was primarily interested in the number of Mid-Continent's shares to be received in exchange and the resulting dividend income, but he was also concerned that his son, Rex Darley, receive a satisfactory employment contract to manage Home and that Home's employees be continued in their retirement program.

After studying Home's latest balance sheet and operating statements, Weston indicated that he was ready to make a firm proposal, and Lon Darley invited him to do so. Accordingly, on October 29, 1968, Weston submitted a written offer by which Mid-Continent proposed

to acquire Home (its assets and liabilities) upon an offered consideration of 56,000 shares of Mid-Continent common stock to be distributed to Home's five common shareholders on a tax-free basis. This offer, which was made at Olive Branch, Mississippi, was rejected by Lon Darley because he deemed 56,000 shares to be an insufficient consideration.

About a week later, Weston submitted to Lon Darley a second written offer, which was identical in form with the prior one, except that the proposed consideration was increased to 60,000 shares of Mid-Continent stock. Lon Darley discussed the offer with his son, Rex, and his stepson, Ben Mitchell. He had authority from all common stockholders, other than Rex Darley, to bind Home in such transaction as he might approve. After this second proposal, Lon and Rex Darley sought a meeting at Hudson, Ohio, with Weston and other Mid-Continent officials and advised that 60,000 shares were still inadequate. At this meeting the figure of 64,000 shares of Mid-Continent stock was finally agreed upon. Weston immediately prepared a letter, using a standard form followed by Mid-Continent in similar acquisitions, in which he set forth the new proposal in substantially the same form as the two prior offers which had been rejected. This letter read as follows:

" * * * The purpose of this letter is to put in writing *the terms and conditions of an agreement that we would propose to enter into with your company,* which we hope you will approve and recommend to your shareholders.

We *hereby offer to enter into an agreement to acquire* for transfer to a new subsidiary of Mid-Continent *the assets and liabilities of the Home Telephone Company on such basis as will permit a tax-free distribution to your common shareholders of 64,000 shares of the common stock of Mid-Continent Telephone Corporation."* [3] (Emphasis added)

3. Other pertinent provisions of the offer are as follows:

"The proposal outlined above is based upon the representations and data furnished to us in your Balance Sheet and Operating Statement through the year ended December 31, 1967 and June 30, 1968.

It is our understanding that your company now has outstanding a total of 2,000 shares of common stock, par value $0 per share; that there are in existence no options or contracts providing for either sale or purchase by your company of its common shares, and that all such outstanding common stock has been duly authorized and validily [sic] issued and is fully paid and nonassessable.

It is our further understanding that there are in existence no lawsuits or threatened lawsuits against your company. It is also our understanding that your company has no long-term contracts of an unusual nature outstanding with either individuals or corporations. This offer would be further based upon the understanding that between the time of your approval and the date of closing, we will be given full opportunity to examine all records of the Home Telephone Company. *This offer would be contingent upon working out a mutually satisfactory arrangement for the continued employment* *of certain management personnel of your company.* It is proposed that employees of the Home Telephone Company be included in a retirement program providing for an annual retirement income not less than the following: the sum of one-half of one percent of the first $4,800 of final earnings plus one per cent of the excess, multiplied by the total numer of continuous years of service with the company prior to and following any merger. Final earnings is meant to be the average of the highest five consecutive basic years immediately preceding retirement. Normal retirement requires attainment of age sixty-five with ten years of continuous service. Early or postponed retirement is available with approval by the company.

Upon approval of our offer *we would promptly assist you* in the preparation of the necessary contracts and documents required for notification of your shareholders of this proposal and in the solicitation of proxies for a special meeting of your shareholders. We wish to assure you that *if our offer is accepted, Mid-Continent would, after reorganization, continue operations* of the Home Telephone Company with the objective of providing the best possible telephone service with the guidance of its Board of Directors." (Emphasis added)

This letter, which was addressed to Home's Board of Directors, was presented to Lon Darley and he was requested to accept it as Home's president. This he did by signing at the signature space provided at the end of the proposal. At Weston's request, Rex Darley also indicated his acceptance by signing the proposal. This agreement was executed at the Holiday Inn at Hudson, Ohio. Lon Darley, who was then 75 years of age, made it plain that while he intended to retire from the business, his son, Rex Darley, wished to remain in Home's management and Mid-Continent would have to work out with Rex a mutually satisfactory contract for his continued employment. Although Mid-Continent was agreeable to continuing in Home's employ other management personnel, an employment contract for Rex was made a material condition of the agreement. At this same meeting in Ohio Weston and Rex Darley had preliminary discussions regarding an employment arrangement, but they came to no agreement at that time.

Lon Darley requested Mid-Continent not to make any news release or public announcement of the agreement prior to his own announcement of the transaction. This was done. At the request of the Darleys, Weston and other Mid-Continent representatives on November 18 attended a meeting at Memphis, Tennessee, at which all of Home's directors except one, namely, Lon Darley, Rex Darley, William W. Kerr and Thomas Doddridge, were present. Also present were other local citizens whom the Darleys had suggested as prospective directors for Mid-Continent's new subsidiary. At this meeting Lon Darley announced the agreement made with Mid-Continent and gave his reasons for the merger. Home's directors who were present voiced no objection to the proposal but acquiesced in it. On the very next day, the Darleys held a meeting with Home's employees and informed them of the impending merger and assured them that their employment benefits would continue. Jimmy D. Young, the only director absent from the previous meeting, was present on this occasion and acquiesced in the merger.

Shortly after the meeting of Home's employees at Olive Branch, a public press announcement, prepared by Mid-Continent and approved by Lon Darley, was released in various local and national newspapers selected by the parties. The lead paragraphs of the news release read as follows:

"Directors of Home Telephone Company of Olive Branch, Mississippi, have agreed to merge into Mid-Continent Telephone Corporation, according to a joint announcement by Lon J. Darley, president, and Weldon W. Case, Mid-Continent Chief Executive.

Following approval by its shareholders and regulatory authority, Home Telephone Company will become an autonomous affiliate of Mid-Continent System, with its own officers, directors and employees."

Thereafter Lon Darley reported to his sons, Lon Darley, Jr., and Howard Darley, who were common stockholders, that Home had made a merger agreement with Mid-Continent. Approving this action, they endorsed their stock certificates in blank and delivered them to Lon Darley for use at time of the closing of the trade. The other stockholder, Ben Mitchell, was also notified by Lon Darley in reference to the signed agreement with Mid-Continent and Mitchell signified his approval. No effort was made by Lon Darley to advise Home's preferred shareholders as to the merger.

No meeting of Home's directors or stockholders was ever called to ratify the agreement or otherwise approve the merger.

Subsequent to the execution of the November 15 letter-agreement, Mid-Continent's officials and the Darleys, principally Rex Darley, had numerous contacts regarding different phases of the proposed merger and carrying out preliminary steps. Mid-Continent's administrative officials from various operating departments had many contacts personal-

ly and by telephone and correspondence with Home's personnel with a view of familiarizing them with Mid-Continent's procedures and techniques. In due course, Mid-Continent's directors ratified the letter-agreement of November 15 and set aside 64,000 shares of its stock for the exchange. Based upon the November 15, 1968, market closing price of 22⅜, these shares were worth $1,432,000.

In January 1969, while again at Hudson, Ohio, Rex Darley resumed discussions with Weston regarding his employment contract, and requested a ten-year employment contract with Mid-Continent for the management of Home as its president at an annual salary of $17,500. Weston declined to meet these terms, making a counter-offer of a management contract with Home for five years at $16,500 per annum. The matter was for the time being left unresolved but open for further negotiations. Rex Darley did not lose his enthusiasm for the merger and continued to actively participate in discussing and planning various features of the merger.

The reorganization plan, which was to be a joint effort of the parties or their respective attorneys, began to receive the attention of Mid-Continent's attorneys at Columbus, Ohio, in early January 1969, and they assembled data necessary for inclusion in a plan of Home's reorganization and conferred with Home's attorneys at Olive Branch in respect to various details, notably whether Home's preferred stock might be bought up by the Darleys, redeemed by Home or otherwise dealt with. If the preferred stock could be purchased or redeemed, Mid-Continent's attorneys, because of convenience, proposed a "B" reorganization under § 368 of the Internal Revenue Code,[4] providing for a "stock for stock swap". Since, however, it was ascertained that Home's preferred stock could be neither purchased nor redeemed, Mid-Continent's attorneys decided that a "C"

reorganization or a "stock for assets swap" (which was the type described by the November 15 agreement) would have to be followed. Various contacts by telephone and correspondence ensued between Mid-Continent's attorneys and Home's attorneys, and as a result of the need for obtaining certain information from Home's attorneys at Olive Branch, there was delay in Mid-Continent's attorneys' submission of a draft of a plan of reorganization. This draft was not forwarded to Home's attorneys until March 10, 1969, and had been prepared on the basis of plans previously used by Mid-Continent in merger transactions, but, as a special provision, the draft proposed to distribute additional shares of Mid-Continent stock to Home's preferred stockholders on a specified basis of exchange (½ share of Mid-Continent common for each share of Home preferred), with the right of any preferred stockholder objecting to the exchange to receive in cash the value of his shares as a stockholder dissenting to the merger. The "Pemberton draft" also contained, in addition to clauses directly relating to an IRS tax-free ruling, various provisions of a substantive nature which Mid-Continent's counsel deemed appropriate to effectuate the transaction but had not been included in the November 15 proposal. The draft also failed to incorporate or otherwise settle a management contract for Rex Darley.

As soon as the proposed reorganization plan was received by Home's attorneys, it was submitted to Lon Darley, who examined it and immediately found various terms objectionable. No effort was made by the Darleys, or their attorneys, to negotiate any areas of disagreement; in fact, no protest of any kind was communicated to Mid-Continent's counsel regarding the plan, or its contents. Lon Darley instead sought and obtained an opinion from Home's attorneys that the November 15 agreement was not legally binding and Home had the right to withdraw therefrom.[5] On March 19, Lon

4. 26 U.S.C. § 368.

5. Home's attorneys in their written opinion of March 14, 1969, expressed the view

Darley forwarded to Weston a letter undertaking to terminate the agreement.[6] Lon Darley and Rex Darley thereafter refused to reconsider the matter and regarded it as closed despite the appeals of Mid-Continent's officials to proceed with the transaction.

Notwithstanding his acceptance of the November 15 agreement, Lon Darley felt free to discuss proposals from other parties to acquire Home. In December 1968 and again in early February 1969 he had certain discussions with Charles and Joe Fail, as prospective buyers, who undertook to sell him on the advantages of a cash sale in contrast to a tax-free stock exchange. On two separate occasions they orally submitted cash offers of $1,600,000 for Home's common stock. The Darleys were told by the Fails' tax advisor, Walter Frank, that in a tax-free stock exchange, they would receive unregistered stock which was subject to restrictions affecting its marketability in event of early sale. Walter Frank, who attended these meetings, notified Clarke Williams, who was also his client and a prospective purchaser of Home, that Lon Darley was beginning to favor a cash proposal, but he would not deal with the Fail brothers because they were not financially able to provide Home with substantial capital funds to meet service requirements.

Thereafter, Williams, a person of large net worth, met with Lon and Rex Darley in Memphis on February 28 and offered to purchase Home's common stock for approximately $1,650,000 cash. At this meeting Lon Darley advised Williams that it would take $2,000,000 cash to purchase the stock. Lon Darley calculated this would be the cash equivalent of the Mid-Continent offer plus about $600,000 for payment of capital gains taxes. Williams knew, or had reason to know, that Home had entered into a merger agreement of some nature with Mid-Continent but he did not at any time inquire of the Darleys as to its status, or otherwise investigate the situation.

On March 10 Williams made a firm $2,000,000 cash offer for Home's common stock and delivered to Lon Darley his personal check for $100,000 to bind the deal. At this juncture the Darleys advised Williams that a merger agreement had been signed with Mid-Continent and they needed to obtain a legal opinion from their counsel regarding its obligatory effect before responding to his offer. Williams made no move to check into the matter. It was approximately at this time that Home's attorneys, who were unaware of the Williams offer, had received the draft of the reorganization plan from Mid-Continent's attorneys and were requested by Lon Darley to give an opinion as to its enforceability. The Darleys offered to show Williams a copy of the November 15 agreement, but Williams declined to make such examination, stating that the less he knew about it the better. At this same meeting the Darleys told Williams that it was possible that Mid-Continent would sue if Home's stock were sold to him.

that the agreement's phraseology that "this offer would be contingent upon working out a mutually satisfactory arrangement for the continued employment of certain management personnel in your company" would relieve Home of any liability "if, in fact, agreements to salaries of these management personnel cannot be reached." It was also observed that "no official meeting of the Board of Directors or stockholders of the corporation had been called and the minutes of the corporation do not reflect any authority to sell the assets of the corporation."

6. This letter, which was prepared by Home's attorneys, read as follows:

"Due to local pressures and problems that have arisen during our negotiations, The Home Telephone Company has decided not to proceed further with the proposed transfer of its stock to the Mid-Continent Corporation. This decision is based primarily on what we consider to be the best interests of the company and the community which we serve, and is in no way a reflection on you or your organization.

We sincerely appreciate the courtesies extended to us by you and your organization, and regret that it has become necessary to make this decision."

The Darleys decided to accept the $2,-000,000 cash offer from Williams and the funds were paid over to Home's common stockholders on or about March 24, 1969, when the 2000 shares of Home's common stock, duly endorsed, were delivered to Williams by all the Darleys. The stock was actually transferred to Union, a Mississippi corporation which had been organized by Williams for the sole purpose of receiving the stock. At the same time, Rex Darley executed a management employment contract with CT&E, Union's parent, for a ten-year period at an annual salary of $18,000.[7] These transactions completed the sale of Home's stock to Union, which ignored all subsequent demands of Mid-Continent that the November 15 agreement had been breached by the Darleys and that Mid-Continent had the right to compel performance from not only the Darleys but Williams and Union.

Until Williams made his aforesaid offer, the Darleys had given no indication to Mid-Continent that they would not carry out the November 15 agreement, but upon the receipt of that offer they lost interest in the Mid-Continent transaction and afforded no opportunity for the parties to resolve any area of disagreement remaining to effectuate the merger.

Mid-Continent now seeks specific performance against Home, the Darleys and Union to compel performance of the November 15 agreement in accordance with its several conditions or, alternatively, should specific performance be unavailable, substantial damages for breach of contract. Mid-Continent also seeks substantial damages in tort against Union on the ground that it is responsible for the wrongful acts of Williams who induced breach of contract and interfered with plaintiff's contractual rights.

All defendants contend that the November 15 agreement is not a binding contract but merely an executory agreement to negotiate for a merger agreement in the future; that, even if enforceable, the document is, as an offer and acceptance, so lacking in essential terms and subject to unfulfilled conditions that specific performance may not be decreed; and, that in any case, Mid-Continent sustained only minimal damages. Union also denies liability for tortious interference with contractual relations on the ground that neither it nor Williams had requisite actual knowledge of such relations as to charge them with any responsibility for the acts of Home or the Darleys, and that they acquired Home's stock in good faith, for value and without notice of Mid-Continent's claim.

I.

A preliminary question in this diversity case is whether the substantive law of Mississippi or of Ohio applies to determine the parties' rights, duties and remedies under the November 15 document, although counsel at trial agreed that Mississippi law was probably controlling under the "contacts" or "center of gravity" doctrine. Resort is usually made to the conflict of law rules of the forum state.[8] In the absence of an intention expressed by or fairly attributable to the parties, Mississippi has applied the law of the state in which the contract was made, "made" being defined as signed and accepted;[9] but if the contract is to be performed in a state other than the one in which it is made, Mississippi would ordinarily apply the law of the state of performance.[10] Mississippi has also recognized the "center of gravity" doctrine as a rule which applies the law of the place which has the most significant relationship to the

---

7. At time of trial, this employment contract had been terminated by mutual consent and Rex Darley was no longer connected with Home's management.

8. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941).

9. Couret v. Conner, 118 Miss. 374, 79 So. 230 (1918); Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 169 Miss. 196, 188 So. 539 (1939).

10. English v. Ins. Co. of North America, 270 F.Supp. 713, 716 (N.D.Miss.1967).

events and parties, or which, because of the relationship or contact with the events and parties, has the greatest concern with the specific issues arising out of the litigation.[11]

While the November 15 letter-agreement was in fact signed in Ohio, that appears to be an almost fortuitous circumstance since the most important contractual contacts occurred within the State of Mississippi and not Ohio. Mid-Continent had sent its representatives into Mississippi over a period of months for the conduct of practically all of the negotiations leading to the agreement, twice made bona fide offers in Mississippi to purchase Home; and Home, a Mississippi corporation, has its res, which was the subject matter of the contract, located permanently in that state where virtually all of its telephone business is transacted. These factors convince us that the center of gravity in the contractual relations is found within Mississippi, and the substantive law of that jurisdiction should control. However, we may add there appears to be no appreciable difference between the rules of law in Mississippi and Ohio to the extent that they will be here recognized. Under applicable principles, we conclude that Mid-Continent is entitled to be awarded certain relief against Home for breach of contract, and also against Union for interference with contractual relations.

### II.

The first substantive issue is whether the November 15 agreement is a valid and binding bilateral contract. Defendants challenge its validity on the following grounds:

 A. It was merely a preliminary memorandum by which the parties did not intend to be bound prior to the execution of a formal contract.

 B. It was not sufficiently definite to be legally enforceable.

 C. It did not comply with Mississippi's statutory requirements for the sale of corporate assets other than in the course of ordinary business.

 D. It is within the statute of frauds since Rex Darley's employment contract, which was for a period in excess of 15 months, was never reduced to writing.

We find no merit in these contentions although the first two grounds require extended discussion.

### A.

■ The foremost contention of defendants is that the informal agreement of November 15 was nothing more than a preliminary memorandum under which the parties agreed upon a 32 for 1 stock exchange ratio. Since both Mid-Continent and Home contemplated the execution of a formal contract by adopting a plan of reorganization after its various terms, including an employment contract for Rex Darley, had been settled or agreed upon, it is contended that, prior to the execution of a plan of reorganization, neither party was bound by the brief memorandum. Defendants invoke the familiar rule that a "contract to make a contract" is not a contract at all if any material term is left open for future settlement.[12] It is undeniably true that "as long as both parties contemplate that something remains to be done to establish contractual relationship, no contract

11. Craig v. Columbus Compress & Warehouse Co., 210 So.2d 645 (Miss.1968). For good discussions of the "contacts" doctrine in Mississippi, see Crawley, "Conflict of Laws in Mississippi as to Contracts," 14 Miss.L.J. 240–256 (1942), and Wilkins, "Conflict of Laws—Conditional Sales Contract—Lex Loci Contrac- tus to Govern," 37 Miss.L.J. 478–480 (1966).

12. Betty Lee Shoes, Inc. v. Karl's Shoe Stores, Ltd., 293 F.2d 429 (5 Cir. 1961); Mississippi and Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063 (1894); 17 Am.Jur.2d, Contracts, § 26, p. 363; see Ann. at 165 A.L.R. 764.

has been made." [13] Conversely, a contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement, for two persons may fully agree upon the terms of a contract, knowing there are other matters on which they have not agreed and expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract. This may be true even though they expressly provide in their agreement that the new matters, when agreed upon, shall be incorporated in the formal document along with the contract already made.[14] Furthermore, where all substantial terms of a contract have been agreed upon, and there is nothing left for future settlement, the fact alone that it was the understanding that the contract should be formally drawn up does not leave the transaction incomplete and without binding force, *in the absence of a definite intention that it should not be binding until so formally executed.*[15]

■ Whether contracting parties are bound by an informal agreement prior to the execution of a contemplated formal writing is a matter of intention to be determined by the surrounding facts and circumstances of each particular case. Certain circumstances have been suggested as helpful for determining such an intention, as, for example: whether the contract is usually one put in writing; whether there are few or many details; whether the amount involved is large or small; whether it requires a formal writing for a full expression of the covenants and promises; and wheth-

er the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations.[16] The foregoing circumstances are merely considerations to be resorted to where the agreement itself is ambiguous and the evidence otherwise fails to show a positive intention of the parties. Here, the problem is not without its difficulties especially since the agreement is somewhat ambiguous and there was conflicting testimony from the parties as to their interpretation of it. Under such circumstances intention must be determined from a consideration of the document and the acts and outward expressions of the parties.[17] Upon the basis of the overwhelming evidence in this case, as gathered not only from the words used in the document itself but also from the parties' conduct both before and after its execution, the court concludes that Mid-Continent and Home intended to make a binding contract.

■ We first note that Weston's letter expressed in specific terms a present offer to enter into an agreement for purchasing the assets and liabilities of Home for a stated consideration, 64,000 shares of Mid-Continent stock, payable to Home's common stockholders only in a specified manner, i. e., a tax-free distribution upon the transfer of Home's assets and liabilities to a new Mid-Continent subsidiary. Defendants argue that certain words of the written proposal such as "an agreement that we *would* propose *to enter into*" (in the first paragraph), or "upon approval of our offer we *would* promptly assist you in the preparation of the necessary contract

13. General Motors Corp. v. Keener Motors, Inc., 194 F.2d 669 (6 Cir. 1952). Cf. Joseph v. Doraty, 144 N.E.2d 111 (Ohio App.1957).

14. 1 Corbin on Contracts, § 29, pp. 94–95. To same effect 17 Am.Jur.2d, Contracts, § 26, p. 362.

15. McMillen v. Willis Sales Corp., 118 Ohio App. 20, 193 N.E.2d 160; Smith v. Onyx Oil & Chemical Co., 218 F.2d 104 (3 Cir. 1955); Federal Security Ins. Co. v. Smith, 259 F.2d 294 (10 Cir.

1958); 17 Am.Jur.2d, Contracts, § 28, p. 365.

16. Mississippi and Dominion Steamship Co. v. Swift, supra. 17 Am.Jur.2d, Contracts, § 29, pp. 366–367.

17. Miss. Rice Growers Ass'n. (AAL). v. Pigott, 191 So.2d 399 (Miss.1966); Hill v. Capps, 248 Miss. 601, 160 So.2d 186 (1964). Cf. Retterer v. Bender, 106 Ohio App. 369, 154 N.E.2d 827 (Ohio App.1958).

and documents", or "if our offer is accepted, Mid-Continent *would*, after reorganization, continue operation of Home Telephone Company" (in the concluding paragraph), anticipate a future agreement, thereby negating an intent to be presently bound. This argument has no merit because in ordinary usage, the word "would" denotes a present wish or desire, and is consistent with an in praesenti offer, which ripened into a bilateral contract immediately upon its acceptance. The essence of the proposal is found in the second paragraph of the letter which states: "We *hereby offer* to enter into an agreement"; such words are clearly the expression of a present offer. Other terms of the letter are likewise couched in language indicating a present undertaking. Moreover, the evidence shows that prior to the drafting of the letter Weston and the Darleys reached an oral agreement on the number of Mid-Continent shares to be offered, so that, logically some further purpose, apart from agreeing on the number of shares, must be ascribed to the drafting, signing, and acceptance of the letter. The letter itself reveals that purpose: "To put in writing the terms and conditions of an agreement."

■ Defendants assert that the informal agreement must fail because certain material terms were omitted from it or expressly left open for future negotiation. They point out that the parties were to arrive at a mutually acceptable plan of reorganization and also a mutually satisfactory employment for Rex Darley, and that the informal agreement did not even attempt to settle either matter. In answering this contention, it is pertinent to observe that from the extrinsic relevant evidence, including reasonable implications drawn from the terms of the informal agreement, the merger was subject to at least four conditions precedent, to-wit: (1) securing a favorable ruling from IRS; (2) obtaining requisite approval from regulatory authorities

including REA which had a loan agreement against Home's property; (3) working out a mutually satisfactory employment contract with Rex Darley; and (4) fulfilling the foregoing three conditions within a reasonable period of time. Without doubt these conditions precedent were highly material to the parties. It is settled law that a condition precedent may be a condition which must be performed *before the agreement of the parties shall become a binding contract* or it may be a condition which must be fulfilled *before the duty to perform an existing contract* arises.[18]

■ In the case at bar the parties clearly made the fulfillment of each of the four stated conditions precedent to performance of an existing contract and not precedent to the formation of a binding contract. For example, the parties certainly did not intend to postpone the contractual relationship until IRS gave a favorable ruling or until the regulatory authorities gave their consent, yet each was a necessary condition which had to be met before the merger could be closed. Similarly, an agreement on a mutually satisfactory contract with Rex Darley, although a necessary condition precedent to performance, was not a prerequisite to the existence of a binding contract. Thus, the informal agreement may not be defeated simply because it reserved for future settlement a mutually satisfactory employment contract. Finally, throughout their dealings, the parties regarded a plan of reorganization as a mechanical detail for securing a favorable IRS ruling, and not otherwise material to their agreement. We hold that the November 15 agreement is a document which contains all terms deemed essential by the parties to the formation of a binding contract and it may not be rejected because the parties contemplated certain further conditions had to be met before the duty to perform would arise.

■ Courts give great weight to the fact that all prior negotiations of

---

18. 17A C.J.S. Contracts § 338, pp. 318–319; 17 Am.Jur.2d, Contracts, § 321, p. 751; Restatement, Contracts, § 250; 3A Corbin on Contracts, § 628, p. 16.

parties were directed, as the evidence here shows, toward reaching a binding contract.[19] It is quite clear that Weston and the Darleys spoke and acted as if their negotiations had culminated in an understanding. Tangible and objective manifestations of intent control over subjective, unrevealed intentions.[20] Among acts of parties often regarded as determinative are the *signing* of written contracts as expressing an intention to be bound.[21] The actual signing by the Darleys of the document under the word "accepted" is strongly indicative of their intention to form a binding contract, particularly in light of the fact that they had previously declined to sign the acceptance clause of two prior offers. Furthermore, where one party begins performance, with knowledge and approval of the other, it is nearly always evidence of intention to be bound.[22] The evidence discloses that both Mid-Continent and Home openly took steps looking toward the consummation of the merger.

 Counsel for defendants vigorously urge that the readiness of the Darleys to discuss other offers for the purchase of Home, despite acceptance of the Mid-Continent proposal, discloses a clear intention not to be bound. We are unpersuaded by this argument for the reason that there was no bar to the Darleys discussing and considering other proposals in case the several conditions to the closing of the Mid-Continent merger were not met, but whatever the surmise of the Darleys, Home was not at liberty to ignore its binding agreement. It is significant that the Darleys would not accept Williams' offer without first consulting an attorney as to Home's liability to Mid-Continent and they cautioned Williams that Mid-Continent might file suit. This is wholly inconsistent with the Darleys' present position that they never intended Home to be, or thought that it was, bound by the November 15 agreement. We also reject the argument that the parties would not have intended to be bound by a writing so brief and informal in a matter of this magnitude, for they had the right, if they chose, to contract in such manner, so long as their words had an understandable and reasonably certain meaning.

Defendants urge that the Fifth Circuit decision of Betty Lee Shoes, Inc. v. Karl's Shoe Stores, Ltd., supra (Fn. 12), applying Texas law, compels a contrary result. That case is clearly distinguishable in that the suit was based upon an employment contract sought to be enforced by the plaintiff where not only its terms had not been fully agreed upon or defined but the employment contract itself was to be entered into only on the express condition that the parties should consummate an agreement of purchase and sale of store inventory, which was never done. Thus it appears that the employment contract, even if its terms were adequately spelled out, was contingent upon the purchase agreement, which did not materialize. Here, plain-

19. McDaniel Bros. Construction Co. v. Jordy, 195 So.2d 922, 924 (Miss.1967); Globe Steel Abrasive Co. v. National Metal Abrasive Co., 101 F.2d 489, 492 (6 Cir. Ohio. 1939).

20. Rice Growers Ass'n. v. Pigott, supra, 191 So.2d at 402–403; Landry v. Moody Grishman Agency, Inc., 254 Miss. 363, 181 So.2d 134, 139 (1965). Cf. Woods v. 53rd Union Trust Co., 54 Ohio App. 303, 6 N.E.2d 987, 989 (1936), and Bach v. Friden Calculating Machine Co., 155 F.2d 361 (6 Cir. Ohio, 1946). 17 C.J.S. Contracts § 32, pp. 640–642; 17A C.J.S. Contracts, pp. 66–67. See Williston on Contracts (Jaeger Ed.), Vol. 1, § 21.

21. John Hancock Mutual Life Ins. Co. v. Webcor, Inc., 311 F.2d 701, 705 (7 Cir. 1962). "Signatures to obligations are not mere ornaments." Retterer v. Bender, supra. Ohio also recognizes the rule that there is a "legal presumption that the parties to a written contract intend that it should be an enforceable obligation." Reese v. Walker, Ohio Mun., 151 N.E.2d 605, 77 Ohio L.Abst. 583 at 585 (1958), and Brawley v. Anderson, 80 Ohio App. 15, 74 N.E.2d 428, 48 Ohio Law Abst. 250 (1947).

22. Corbin, Contracts, § 95, p. 407 (1963).

tiff does not sue to enforce an employment contract whose terms were never worked out but seeks to recover upon a basic purchase agreement to which the employment contract was merely a condition precedent for performance. Other cases cited by defendants are not factually in point and are distinguishable from the present situation and thus not persuasive here.

## B.

Defendants' second contention is that the November 15 agreement is not sufficiently definite and certain to be legally enforceable. While both parties may think they have made a contract, they may not have done so because of utter indefiniteness or incompleteness in their undertaking,[23] and courts cannot make an agreement which the parties themselves have failed to form through lack of expression or understanding. However, the law favors a determination that an agreement is sufficiently definite and will not allow a contract to fail for uncertainty "if it contains matter which will enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if neces-

sary relevant extrinsic evidence."[24] Once the court has found that a contract was made, the agreement should not be frustrated where it is possible to reach a fair and just result, "even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left."[25] Mississippi has recognized that where the nature of the situation prevents precise advance designation of details, somewhat less precision is required of the parties in drafting a binding agreement.[26]

In the final analysis, a contract becomes enforceable against the objection of apparent uncertainty and indefiniteness when a court is able to determine as a fact that the agreement is complete by resorting to objective external standards, or commercial practice, or other usage or custom fairly shown to be within the contemplation of the parties.[27] An equally well-settled rule, recognized by Mississippi, is that courts will imply that the laws in force when a contract was made were intended by the parties to be part of the contract as much as if they had been expressly incorporated therein.[28]

Defendants assert that the November 15 agreement is too indefinite to be bind-

**23.** Under Mississippi law a contract may be too indefinite to be enforced. Quick and Grice v. Ashley, 227 Miss. 273, 86 So.2d 40 (1956).

**24.** Jones v. McGahey, 187 So.2d 579 (Miss. 1966), suggestion overruled 191 So.2d 532 (Miss.1966). In reversing a lower court decision which had denied specific performance of a "rather loose agreement", Chief Justice Ethridge said:

" * * * Determination that an agreement is sufficiently definite is favored in the courts, so as to carry out the reasonable intention of the parties if it can be ascertained. A contract is sufficiently definite if it contains matter which will enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence. Having found a contract to have been made, an agreement should not be frustrated where it is possible to reach a reasonable and fair result. Corbin, Con-

tracts § 95 (1963); 17 Am.Jur.2d Contracts §§ 75–77 (1964); cf. Russell v. Douglas, 243 Miss. 497, 504, 138 So.2d 730 (1962). * * *"

**25.** Corbin on Contracts, § 95, at 400 (1963). See Armstrong v. Southern Production Co., 182 F.2d 238, at 241 (5 Cir. Miss.1950), and Pugh v. Gressett, 136 Miss. 661, 101 So. 691 (1924).

**26.** Vicksburg Water Works Co. v. J. M. Guffy Petroleum Co., 86 Miss. 60, 38 So. 302 (1905). The principle of *Vicksburg Water Works* was applied by the Fifth Circuit in Jackson v. Sam Finley, Inc., 366 F.2d 148 (5 Cir. 1966).

**27.** Corbin on Contracts, §§ 95, 400, 401 (1963); Williston on Contracts (Jaeger Ed.) Vol. 1, § 47, p. 153, et seq.

**28.** 3 Corbin, § 561; Tucker Printing Co. v. Board of Supervisors of Attala County, 171 Miss. 608, 158 So. 336 (1934); Mississippi Valley Gas Co. v. Boydstun, 230 Miss. 11, 92 So.2d 334 (1957).

ing because of its omission of four vital terms:

1. The type of Mid-Continent stock which was offered, i. e., whether it was to be registered or unregistered.

2. The disposition of the 398 shares of Home's preferred stock.

3. The nature and scope of the plan of reorganization.

4. The terms of Rex Darley's employment contract.

Plaintiff urges that the court may, under the rules stated above (Fns. 24–28), reasonably imply each of the four terms whose omission defendants claim defeats the contract.

■■■ We first consider defendants' contention that the agreement fails because it did not expressly state whether or not the Mid-Continent stock was to be registered with the Securities & Exchange Commission. This argument is without substance because Weston told the Darleys they would have to sign a letter of intent to hold the stock for investment purposes, and not for sale or distribution. Lon Darley was agreeable to this condition because his intention was to keep Mid-Continent's dividend-paying stock.

The evidence also revealed that it was a well-known custom in the area of corporate mergers involving tax-free stock exchange to issue unregistered stock, and courts will look to such usages to determine what parties intended their contract to mean.[29] The underlying purpose of this custom was to avoid the stringent provisions of the Securities Act of 1933,[30] which require all public stock issues not exempted by law to be registered with the Securities & Exchange Commission, a costly and time-consuming procedure which, if followed in all cases, might well prevent many mergers. To facilitate mergers, therefore, corporate experts have almost universally adopted the custom of issuing unregistered stock where it is possible to qualify the issuer's shares as a "private offering", i. e., to persons who are in such position with respect to the issuer that they should already know the information which a registration statement would have revealed,[31] as was the case with Home. In light of the clearly-established custom in tax-free corporate reorganizations and the plain understanding of the Darleys that they would be holding the Mid-Continent stock for investment purposes under a letter of intent, we find that the November 15 contract necessarily implied the use of unregistered stock in the merger.

■■■ Next we consider the omission of any reference to Home's preferred shareholders in the informal agreement. The controlling factor in this regard is the parties' firm agreement for the sale of all corporate assets and the liquidation of Home. In such case, Mississippi law requires that at least ⅔ of all the shareholders approve corporate liquidation.[32] All of Home's common shareholders, who constituted 85% of Home's total shareholders, both common and preferred, approved the sale and liquidation. The evidence failed to indicate the wishes of the preferred shareholders, but even assuming that all were opposed to the dissolution, and held full voting rights, they could not have blocked the transaction in light of § 5309–183. Their recourse, in case any proposed exchange ratio was rejected, would have been to claim dissenters' rights under Miss.Code Ann. §§ 5309–171 and 5309–172, which would

---

**29.** Freeman v. Continental Gin Co., 381 F.2d 459 (5 Cir., Miss., 1967).

**30.** 15 U.S.C. § 77d et seq.

**31.** Gilligan, Will & Co. v. Securities & Exchange Commission, 267 F.2d 461 (2 Cir. 1959), cert. denied 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152. See Rule 133, 17 C.F.R. § 230.133 (Supp.1956). By Rule 133, Lon and Rex Darley were the only stockholders classified as members of the control group who would be subject to the restriction of holding stock for investment purposes.

**32.** Miss.Code Ann. § 5309–183; see also 19 Am.Jur.2d, Corporations § 1596, et seq.

have required the fair value of their shares to be paid in cash. The parties discussed the status of the preferred shareholders both before and after the November 15 contract was drawn up and signed, and reference to the preferred stock was omitted obviously because it would have no effect on the merger. Thus, it was fairly implied by the parties' agreement that the preferred shareholders would be paid their interest in cash as dissenting shareholders if the question arose.

■■■ Nor can we sustain defendants' contention that the parties' failure to include any reference in the written document to a plan of reorganization causes the contract to fail for indefiniteness. Although it is true that the contract did not even mention the term, "plan of reorganization", it did mention "reorganization", and paragraph two emphatically required that the stock-exchange transaction be tax-free. The parties also agree that for the merger to be tax-free, IRS would have to rule that it falls within 26 U.S.C. § 361 as defined in 26 U.S.C. § 368(a) (1) (C).[33] The evidence showed that the parties understood this condition and their attorneys were working toward obtaining such an IRS ruling by complying with subsection (a) (1) (C) of § 368. Defendants agree that these requirements are relatively simple, for although each reorganization is factually distinct, and the ultimate determination of its tax-free na-

ture will be made only by IRS, the basic requirements of a tax-free reorganization under 26 U.S.C. § 368(a) (1) (C), both statutory and judge-made, are:

(1) There must be an exchange of stock or securities pursuant to the reorganization of an existing corporate business for the purpose of continuing the same business in a new and modified corporate form;

(2) The stock or securities exchanged must be those of a corporation which is a party to the reorganization;

(3) The exchange must be solely for all or a part of the voting stock of the acquiring corporation;

(4) The acquiring corporation must receive substantially all of the properties of the acquired corporation;

(5) Those persons who were shareholders of the acquired corporation immediately prior to reorganization must, after reorganization, hold stock of the acquiring corporation worth at least 50% of the value of all the stock of the acquired corporation immediately prior to reorganization.[34] These purely legal requirements are all that was legally implied by the clause of the November 15 contract requiring the stock exchange to be tax-free. Whether a given plan of corporate reorganization might also contain many non-tax provisions inserted for the benefit of the parties (Fn. 34) is irrelevant to our present consideration, which is limited to what may reasonably be implied by the November 15 agree-

---

33. § 361. *Nonrecognition of gain or loss to corporations*

 (a) *General rule.*—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

 § 368. *Definitions relating to corporate reorganizations*

 (a) *Reorganization.*—

 (1) *In general.*—For purposes of parts I and II of this part, the term "reorganization" means—

 \* \* \* \* \*

 (C) the acquisition by one corporation, in exchange solely for all or a

part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, \* \* \*.

34. 3 Mertens, Law of Federal Income Taxation, §§ 20.54–20.64 (1970); Darrell, "The Use of Reorganization Techniques in Corporate Acquisitions", 70 Harv.L. Rev. 1183–1237 (1957); Manning, "In Pursuance of the Plan of Reorganization", 72 Harv.L.Rev. 881–918 (1959); 2 CCH Standard Federal Tax Reporter, 29,007, § 2500; 2 CCH, supra, 29,148.

ment. There is insufficient factual evidence to hold what a typical reorganization plan contains; we can only say that as a matter of law the contract implied that the parties would furnish sufficient information to IRS concerning the agreed merger to obtain a favorable tax ruling. Nor is it significant that the plan of reorganization later submitted by Mid-Continent for Home's approval contained several non-tax provisions to which Home might have had valid objection or alternate proposals. Parties may always, by common consent, add new provisions spelling out additional details which were not included in their initial contract if they wish to do so. This finding is borne out by the fact that some of the non-tax provisions in the Pemberton draft concern technical, legalistic points which the contracting businessmen, Weston and Darley, considered mere "boilerplate" legal details to be left to their attorneys, and inessential to their basic agreement. A plan of reorganization without elaboration of detail but sufficient to meet IRS requirements for a tax-free merger under § 368 was fairly implied by the November 15 contract.

Also, the same may be said for the necessary approvals of the regulatory authorities, which the informal agreement implied would have to be obtained if the merger were to be consummated.

■ Defendants' final contention is that the contract fails for indefiniteness because it expressly left open Rex Darley's employment contract to be settled to the mutual satisfaction of the parties. We reject this argument also. Although the parties expressly agreed that Rex's employment contract would be "a mutually satisfactory arrangement", the term "satisfactory" does not imply that either party may be arbitrary. It is a longstanding rule of construction that the word "satisfaction" will be construed by courts to mean reasonable satisfaction.[35]

In fact the evidence showed that Weston and Rex were negotiating within well-defined limits and probably headed toward a final understanding. As expounded earlier, agreement on Rex's contract was a condition precedent to closing the merger and not precedent to the existence of a binding contract of merger.

### C.

■ We examine only briefly defendants' contention that the November 15 contract was not binding on Home because it was never formally ratified by its stockholders. As stated before, Lon Darley alone made all important decisions for Home, and after he and Rex had signed the letter, he notified the other common stockholders of his actions, and they signified their full approval. The court cannot pretend that there was no stockholder approval simply because no formal notice was given or face-to-face meeting held. These formal requirements are primarily for the benefit of the stockholders themselves, and can be waived by them,[36] as was obviously the intention of Home's stockholders.

### D.

■ We likewise summarily reject defendants' contention that the entire contract is within the statute of frauds because Rex's employment contract was never committed to writing. The Mississippi statute of frauds, asserted as applicable here, declares that no action shall be brought to charge a defendant on any contract not in writing which cannot be performed within 15 months of its making.[37] Plaintiff, however, does not seek to enforce an oral employment contract (as in Betty Lee Shoes, Inc. v. Karl's Shoe Stores, Ltd., Fn. 12, supra), but the basic merger contract itself. Thus the contemplated employment arrangement, which was merely a condition precedent to closing, was not required in

---

35. Corbin on Contracts, § 95, pp. 401–403, § 445, pp. 83, 84. Borg-Warner Corp. v. Anchor Coupling Co., 16 Ill.2d 234, 156 N.E.2d 513 (Ill.1958).

36. See Annot. 58 A.L.R.2d 784.

37. Miss.Code Ann. § 264(d).

writing to save the basic contract from the operation of the statute of frauds. We are not here concerned with an attempt to enforce an oral contract against anyone. Since Rex's employment contract was not included in the November 15 letter, but was to be a collateral matter, separate and apart from the binding bilateral contract of November 15, 1968, the latter is in no way affected by the statute of frauds.

## III.

■■ Defendants next assert that Home's repudiation of the merger contract was a justifiable rescission and not a breach. Home was within its rights in rescinding, defendants argue, because Mid-Continent's delays in offering Rex a satisfactory employment contract, submitting a reasonable plan of reorganization, and obtaining the requisite regulatory approvals subjected Home to such pressures and problems that it was forced to rescind the merger and take alternative action. These contentions are without merit. The evidence showed that at the time Home refused to continue performance, the parties were moving with reasonable dispatch toward a consummation of the merger, and if there were any delays in preparation of a reorganization plan, both parties contributed thereto. The contract not providing for a specific closing date, the law will imply a reasonable time in light of the circumstances.[38] Here, the parties contemplated closing within four months after submission to IRS of a reorganization plan.

■ Home was under a positive duty to allow Mid-Continent a reasonable time to agree upon a reorganization plan and a contract for Rex Darley, and it could not flatly repudiate the entire agreement without giving Mid-Continent notice of the reasons for its dissatisfaction and a reasonable opportunity to remedy the defects as Home saw them.[39] The evidence showed that while Home needed additional capital to meet its expanding service requirement within a reasonable period, time was not of the essence to the parties. There were, in fact, no local pressures or problems compelling Home to terminate the contract immediately for the purpose of obtaining additional capital from other sources; the only impetus for the decision to repudiate the Mid-Continent contract was the highly profitable cash offer which Home's stockholders received from a third party. On that factual basis, we must hold that Home's action was a wrongful repudiation and breach of its contractual obligations and not a justified rescission.

■■ In like manner, we dispose of defendants' assertion of unilateral mistake. It is clear that Home, acting through the Darleys, understood or should have understood all the material elements of the transaction in question, including the nature of the Mid-Continent stock to be received. Equity will give no relief from a unilateral mistake where the erring party could by reasonable diligence have ascertained the real facts and his own inattention is the primary cause of his mistake.[40] There is no evidence here to justify rescission by this court for unilateral mistake, nor any showing of inequitable conduct on the part of Mid-Continent.

## IV.

Having determined that Home breached its contract with Mid-Continent, we now consider the appropriate relief. Plaintiff seeks specific performance of the contract, as well as damages against Home and the Darleys, and actual and punitive damages in tort against Union.

■ Specific performance is an ancient doctrine first developed by the Eng-

38. Smith v. Mavar, 198 Miss. 170, 21 So. 2d 810, 811 (1945) ; Merrill on Notice, § 528.

39. Boswell v. United States, 123 F.2d 213 at 215 (5 Cir. 1941); 17A C.J.S. Contracts § 422(1), p. 520.

40. Terre Haute Cooperage v. Branscome, 203 Miss. 493, 35 So.2d 537 (1948) ; Hunt v. Davis, 208 Miss. 710, 45 So.2d 350 (1950).

lish courts of equity. Because of that background, courts have long followed the rule that specific performance may not be granted where plaintiff has an adequate remedy at law.[41] Under modern federal procedure, however, such distinctions are now less important and this court, which has power to grant both equitable and legal relief, will examine both remedies to determine which is more likely to do substantial justice in this case.[42]

▨ Generally courts consider several factors in determining the adequacy of money damages as a remedy. Where the plaintiff's loss cannot be adequately measured or the subject matter of the contract is unique and cannot be duplicated on the open market, damages have been deemed inadequate.[43] Specific performance is an ordinary remedy for breach of contract to convey corporate shares where the shares may constitute a controlling interest in a unique corporation.[44] In considering whether to grant specific performance once it has determined that damages would be inadequate, Mississippi jurisprudence recognizes that specific performance will not be granted unless the court can draft a decree that is definite, efficient and practical:

> "Indeed, if the case be such that the decree cannot be made to comply with the foregoing essentials (reasonable certainty and fair precision) and at the same time with the requirement that final decrees shall embrace all the material issues in the case, it may sometimes become a question whether the court will make any decree at all. For instance, in a case of specific per-

formance of a contract where the relief is largely within the sound discretion of the court, the relief may be declined altogether where the court is unable to frame a practical decree that by its terms will cover the subject matter definitely, for equity will not under the pretense of giving a remedy in the absence of a perfect one at law substitute an imperfect, cumbersome and inexpedient equitable one." Griffith's Mississippi Chancery Practice, § 625, pp. 676–7 (1950).

To this effect defendants cite several cases in which specific performance has been refused because courts were unable to prescribe an effective and expedient decree,[45] capable of enforcement without direct superintendence by the court. Plaintiff responds that this is a restrictive and outmoded view and that courts today are inclined to order specific performance despite the apparent omission of some details or conditions from the written instrument, and they cite respectable authority in support of that position.[46]

The apparent conflict between decisions favoring and opposing specific performance in this area of the law convinces us that the basic issue here is one of fact: Could this court draft a definite and workable decree? For several reasons, we conclude that such would not be the case. First, there have been significant changes of position by the parties since the making of the November 15 agreement. Defendants, Lon Darley and Rex Darley, are no longer stockholders of Home, nor are Home's other former stockholders, Lon Darley, Jr., Howard Darley and Ben Mitchell, joined as parties to this suit. Union, who is a

41. Roberts v. Spence, 209 So.2d 623 (Miss. 1968).

42. Corbin, supra, § 1139.

43. Corbin, § 1142.

44. Corbin, § 1148.

45. Bomer v. Canady, 79 Miss. 222, 30 So. 638 (1901); Giglio v. Saia, 140 Miss. 769, 106 So. 513 (1926); Roberts v. Spence, supra; Frostad v. Kitchens, 377 F.2d 475 (5 Cir., Miss., 1967); Hutton v. Hutton, 239 Miss. 217, 119 So.2d 369 (1960); Corbin, §§ 1171, 1174, 1175; Restatement of Contracts, § 370.

46. City Stores Co. v. Ammerman, 266 F. Supp. 766 (D.C.D.C.1967), aff'd. 129 U.S.App.D.C. 325, 394 F.2d 950 (1968); Pugh v. Gressett, supra; Jackson v. Sam Finley, supra; Vicksburg Waterworks, supra; Jones v. McGahey, supra; Williston on Contracts, §§ 1425a, 1441b.

stranger to the contract made with Mid-Continent, is now Home's sole stockholder and as such it has been in charge of operating Home for a period of many months. Union, having paid $2 million for Home's common stock, occupies an entirely different status from the Darleys with respect to a tax-free reorganization and stock exchange. Rex Darley, whose continued employment by Home as its president constituted a material condition for the Mid-Continent merger, is no longer employed by Home, Union having made an undisclosed settlement of his contract.

■ Moreover, under the circumstances, equity would require as a condition of specific performance that the court rescind the purchase agreement between Home's stockholders and Union and direct the return of Union's money, which appears to be impracticable because of absent parties. Apart from the problem of rescission, the court would be confronted with the necessity of framing a decree outlining with certainty the steps to be taken by Mid-Continent and Home (and Union) in carrying out the several conditions of the merger contract, such as a plan of reorganization meeting IRS approval and obtaining requisite consent from regulatory authorities. This court's decree would be rendered futile by the mere failure of the agencies to approve what the court may have ordered the parties to do. There would remain the additional problem of having to deal with an employment contract for Rex Darley. It would be difficult for the court to conclude that the conditions precedent to performance of the Mid-Continent contract, so material at the formation of that contract, should now be waived or ignored. To do that would be to substitute a wholly new contract in place of the one agreed upon by the parties. Because of the foregoing

considerations, we hold that specific performance is not appropriate in this case.

■ However, the inability of a court to grant specific performance does not preclude damages, but they may be awarded even though the contract contains conditions or other elements of uncertainty which would defeat specific performance.[47]

■ The court's purpose in establishing a measure of damages is to restore the injured party to the financial position he would have been in had there been no breach. His recovery is limited to the loss actually suffered by reason of the breach, and he is not entitled to be placed in a better position than he would have been if the contract had been performed.[48] A further general rule is that a party who has broken his contract will not be permitted to escape liability because of the lack of a perfect measure of damages caused by his breach,[49] but damages may not rest on speculation or conjecture upon future events. With these well-known principles in mind, it appears that Mid-Continent did not succeed in its effort to establish a basis for recovering long-term profits from operating Home as a subsidiary, and damages may not be awarded on that basis. Nevertheless, the price which Mid-Continent agreed to pay for Home, i. e., its 64,000 shares worth $1,432,000, was less than Home's fair market value. The weight of the evidence indicates, and the court so finds, that Home's market value was $1,650,000, or $218,000 in excess of the consideration that Mid-Continent obligated itself to pay in stock. We have no doubt that the $2 million actually paid for Home's stock exceeded its real value, as Williams testified, and contained an excess premium chiefly attributable to income tax considerations in the mind of Lon Darley, while the $1,-600,000 offers by the Fail brothers were

47. Roberts v. Spence, supra; Gulbenkian v. Gulbenkian, 147 F.2d 173 (2 Cir. 1945); Glazer v. Glazer, 374 F.2d 390 (5 Cir. La.1967), applying Ohio Law; Corbin, § 1161; Pickett v. Boutwell, 240 Miss. 18, 125 So.2d 822 (1961); Corti v. Continental Copper & Steel Export Corp., 223 F.Supp. 503 (D.C.N.Y.1963).

48. 22 Am.Jur.2d § 47, Damages, p. 74.

49. Koehring Co. v. Hyde Construction Co., 178 So.2d 838, at 853 (Miss.1965).

open, arms-length offers, which Lon Darley rejected only because of the Fails' lack of financial resources for Home's capital needs. According to Williams' testimony, $1,650,000 represented Home's fair market value, and the court accepts that figure as correct. Thus, Mid-Continent is able to demonstrate a direct loss sustained by it in the amount of $218,000 as the difference between what it agreed to pay for Home and the fair market value of Home at the time of the November 15 contract, and it is reasonable to allow this sum against Home because of breach of contract.

 The above damages awarded to Mid-Continent are against Home, the corporation, and not against Lon Darley and Rex Darley individually. This is for the reason that the contract upon which plaintiff sues was one made by Home, and the acts of the Darleys in relation to that contract were in a representative capacity as officers of the corporation. Lon Darley directly signed as president of Home and not individually. While Rex Darley signed in an unstated capacity, he did so at the request of Weston "as an afterthought". The contract was offered not to Lon Darley and Rex Darley individually but to Home, through its stockholders and directors, for acceptance. Mid-Continent understood that it was dealing with Home, the corporation, and that it was to purchase the assets and liabilities of Home, the corporation. It is plain from this evidence that Lon Darley and Rex Darley signed as agents for Home, that they were so authorized to act and in doing so did not become personally liable to Mid-Continent for a breach of Home's contract. It is settled Mississippi law

that an authorized agent acting for a disclosed principal, in the absence of circumstances showing that personal responsibility was intended to be incurred, may not be held personally liable to the other contracting party.[50]

Mid-Continent simply has not shown that the parties intended for Lon Darley and Rex Darley to be personally liable or responsible on the merger contract. In the absence of a cross-claim by Home against Lon Darley and Rex Darley for their acts as officers, directors and controlling stockholders, we expressly pretermit any consideration of their individual liability to Home for financial loss.

### V.

Mid-Continent asserts that Union intentionally interfered with its merger contract, inducing Home's breach, and Union is liable therefor to Mid-Continent in compensatory and punitive damages.

The tort of interference with performance of a contract and the closely related torts of inducement to breach of contract and interference with a lawful business relation have long been recognized by Mississippi.[51]

 Since at least part of Union's alleged interference took place in Tennessee, we note that it also recognizes essentially the same tortious interference doctrine.[52] An action for interference with contract will ordinarily lie when a defendant maliciously interferes with a valid and enforceable contract, thereby causing one party not to perform and resulting in injury to the other contracting party.[53] Malice in this con-

**50.** Chipman v. Lollar, 304 F.Supp. 440 (N. D.Miss.1969); Shemper v. Hancock Bank, 206 Miss. 775, 40 So.2d 742 (1949); McCarty v. Love, 145 Miss. 330, 110 So. 795 (1927); Grapico Bottling Co. v. Ennis, 140 Miss. 502, 106 So. 97 (1925); 3 C.J.S. Agency § 215, 3 Am.Jur.2d, Agency, § 393.

**51.** Irby v. Citizens National Bank of Meridian, 239 Miss. 64, 121 So.2d 118 (1960); Bailey v. Richards, 236 Miss.

523, 111 So.2d 402 (1959); Martin v. Texaco, Inc., 304 F.Supp. 498 (S.D.Miss. 1969); Restatement of Torts, § 766; 86 C.J.S. Torts §§ 42–44; Harper & James, Law of Torts, §§ 6.5–6.8.

**52.** Stringer v. Consumers Credit Corp., 234 Miss. 240, 105 So.2d 756 (1958); see Tennessee cases in Annots. at 26 A.L.R. 2d 1227 and 9 A.L.R.2d 228.

**53.** Martin v. Texaco, Inc., supra; 45 Am. Jur.2d 280–288, Interference, §§ 1–11.

text is the intentional doing of a harmful act without justification or excuse, or stated differently, the wilful violation of a known right.[54] That the injured party also has a right of action for damages ex contractu against the party who breached the contract is not a defense to the interference action.[55] Once injury caused by the interference has been shown, the burden is on defendant to prove that his actions were either without knowledge of the existence of the contract, or were justified.[56]

As previously stated, Union, acting through Clarke Williams, knew or had reason to know that Home had an agreement to merge with Mid-Continent, but notwithstanding, recklessly and deliberately induced Home to breach its contract for Union's own profit. No credible justification or excuse appears from the evidence that convicts Union of tortiously interfering with the merger contract.

In an interference action, the plaintiff need only prove that injury resulted to him from the interference in order to recover substantial damages, but wholly speculative damages based on conjectural profits are not recoverable.[57]

In the present action we have allowed Mid-Continent to recover against Home for the loss of its bargain in not acquiring Home Telephone Company. Mid-Continent has sustained other substantial damages as a direct result of Union's tortious conduct, which include various acquisition costs in dealing with Home, and outlays incurred in the present litigation, exclusive of counsel fees. These items approximate $25,000,[58] which sum is allowed as actual damages.

Because of the aggravation in Union's conduct to induce Home to breach its contract, as evidenced by Union's utter indifference and capricious disregard for Mid-Continent's right, we find this is a proper case for assessment of punitive damages, including an award for attorneys' fees incurred by plaintiff in vindicating its rights.[59] Thus, Union is adjudged also liable to Mid-Continent for $70,000 punitive damages.

Let judgment be entered for Mid-Continent against Home for $218,000 and against Union for $95,000.

54. 45 Am.Jur.2d, Interference, § 3.

55. 26 A.L.R.2d 1257; 45 Am.Jur.2d 303, Interference, § 26.

56. 26 A.L.R.2d 1263.

57. 45 Am.Jur.2d 331, Interference, § 57; Bailey v. Richards, supra.

58. 
| | |
|---|---:|
| Acquisition expenses for the 4th quarter of 1968 | 1,215.15 |
| Acquisition expenses for the 1st quarter of 1969 | 1,660.00 |
| Management seminar for Rex | 440.00 |
| Legal services on Nov. 15, 1968 contract | 650.00 |
| Litigation expenses of Mid-Continent staff | 20,347.00 |
| Misc. legal expenses (depositions, etc.) | 636.01 |
| Total costs | $24,948.16 |

59. Cooper v. United States Fidelity & Guaranty Co., 186 Miss. 116, 188 So. 6 (1939); Blum v. William Goldman Theatres, Inc., 69 F.Supp. 468 (E.D.Pa. 1946), aff'd 164 F.2d 192 (3 Cir. 1946); Bailey v. Richards, supra; Milner Hotels, Inc. v. Brent, 207 Miss. 892, 43 So. 2d 654 (1949); see Annot. 9 A.L.R.2d at 1273 and Nichols, "Punitive Damages in Mississippi—A Brief Survey," 37 Miss. L.J. at 141 (1965). We note that Mississippi formerly had a statute allowing double damages in actions for interference with employees; see Hoole v. Dorroh, 75 Miss. 257, 22 So. 829 (1897).