BAILEY, et al. *v.* RICHARDS.

No. 41091 April 27, 1959 111 So. 2d 402

*Lewis & Alexander, Young, Daniel & Coker,* Jackson, for appellants.

*Crisler; Crisler & Bowling,* Jackson, for appellee.

McGEHEE, C. J.

The appellee, Wiley E. Richards, brought this suit in the Circuit Court of Hinds County for damages, both actual and punitive, against the appellants, George Bailey and Mid-States, Inc., of which George Bailey was the president, and against Sam Millstein and J. C. Gibson for the alleged wilful and wanton interference with the formation of a contract for the purchase of a house and lot in Meadowbrook Hills by Mr. and Mrs. A. R. Burgdorff of Birmingham, Alabama, from the owner, J. C. Gibson, who had listed the house for sale through the appellants, George Bailey and Mid-States, Inc., with the Multiple Listing Service, a group of realtors who were members of the Jackson Real Estate Board and who had the option of sharing their exclusive listings of property with the other members of the Multiple Listing Service. The defendant, Sam Millstein, who was a non-member realtor, had shown the property on Saturday, April 27, 1957 to the Burgdorffs but had failed to submit to the owner, Gibson, any offer of purchase whatsoever from the Burgdorffs, but George Bailey claimed that Sam Millstein was asserting some right to share in the real estate commission, and he was sued along with the appellants and the owner of the property on the alleged ground that they all had conspired to prevent the appellee, Richards, from consummating a sale of the property from the owner, Gibson, to the Burgdorffs.

On the morning of the trial of the case a non-suit was taken as to the defendant, Gibson, because of the illness of his mother which prevented his appearance at court at the beginning of the trial, although he later appeared and testified as a witness for the defendants in the case. As a result of the trial, a verdict was returned against the appellants and against Sam Millstein for the sum

of $3,500. Upon motion on behalf of Millstein to set aside the judgment as to him, the trial court held that a verdict should have been directed in his behalf, and the judgment was set aside as to him. The appellee appealed from the said action of the court but did not file an appeal bond within the time provided by law.

Therefore, the appeal here is only by George Bailey and the Mid-States, Inc., of which he is the president as heretofore stated. The proof disclosed that the appellee, Richards, was a duly licensed realtor in Jackson, and that he was a member in good standing of the Jackson Real Estate Board and of the Multiple Listing Service; that on Sunday afternoon of April 28, 1957 he received a telephone call at about one o'clock P. M. from the Burgdorffs who made known to him their desire to purchase a home in Jackson, since they were being transferred here from Birmingham, Alabama. The appellee showed them some houses, some of which he owned personally, but finally Mrs. Burgdorff decided that she liked the Gibson house that she and Mr. Burgdorff had seen the day before alone and then later in company with Millstein, but on which latter occasion they were not sufficiently interested to submit an offer in the amount of the listed price of $26,500, and Millstein did not submit to the owner the counter offer or any other offer made by them to him that he felt justified in submitting to the owner.

Upon the Burgdorffs' evidencing an interest on the next day in the purchase of the Gibson house, and upon the appellee's determining that they were not obligated to any other broker in the sale thereof, and after they had spent some time at this house that Sunday afternoon with the appellee, they made an offer of $25,500 for the property provided certain changes were made in the final completion of the same, which was then in progress. Pursuant to this offer the appellee contacted the appellant, George Bailey, as president of the Mid-States Inc., which had listed the property with the Multiple Listing Service,

as aforesaid, and advised the said Bailey that he, the appellee, had an earnest money deposit in the amount of $300 and an agreement from the Burgdorffs to assign the proceeds of a certain life insurance policy of a cash surrender value of $1,700, making a total earnest money deposit of $2,000.

The proof shows that the said Bailey advised the appellee that the owner, Gibson, lived out of town near Raleigh, in Smith County, and that he would try to contact him that afternoon by telephone and would call the appellee back at around six o'clock P. M.; that according to the testimony of the appellee, the said Bailey did call the owner, Gibson, on the telephone a few minutes of six o'clock P. M., and then informed the appellee that Gibson had been contacted and had agreed to accept the counter offer; that the appellee then obtained a written agreement duly signed by Mr. and Mrs. Burgdorff, offering to purchase the property for the sum of $25,500 which appellee testified he had been advised was acceptable to the owner, Gibson; that during the afternoon of Sunday, April 28th, Woodrow Bailey advised the appellee that the attorney for Gibson and for the appellants had been contacted and that the assignment of the life insurance policy as a part of the earnest money would be acceptable, provided the insurance company signified its acceptance to such assignment.

On the following morning, April 29, 1957, pursuant to an agreement had with the appellant, George Bailey, the appellee delivered the written counter offer at the office of the Bailey Lumber Company in Jackson where the appellee had been advised that it would be turned over by Woodrow Bailey to Gibson, the owner, who usually stopped by the place of business of the Bailey Lumber Company in the early part of the forenoons. At some time during the forenoon of that day the said George Bailey advised the appellee that he understood that Millstein was claiming the sale, and that Millstein was work-

ing through the office of Mid-States, Inc., on the sale of this property, and further informed the appellee that the contract would not be executed unless something was worked out with Millstein for a division of the commission.

The appellee testified further that the said Bailey "declined to present the contract to Mr. Gibson for signature unless I cut (the commission) with Millstein, (in order for him) to get a commission;" that "Mr. Bailey called me at my residence again at noon Monday and advised me that *they* could not sign the contract unless Sam Millstein and I worked something out on our commission"; that appellee "advised Mr. Bailey that I was either entitled to all of the commission or none of the commission," and that I then "offered to escrow the entire commission, if and when due, and turn it over to an arbitration committee to determine to whom the commission belonged." Appellee was then asked, "Q. What was Mr. Bailey's response to that offer? A. There won't be any arbitration; there just won't be any sale." The appellee further testified that "Mr. Bailey advised me he would have Mr. Gibson call me and I believe he did call me at two o'clock Monday afternoon * * *." "Q. Did Mr. Gibson, at any time, during that conversation, evidence to you any refusal to accept $25,500 for the house. A. No, sir. Q. Did he at any time indicate to you that he would not be able to sell the house because of the question of double commission? A. Yes, that was his only reason."

At a conference in the office of Mr. Charles W. Crisler, attorney for the appellee, on the next morning when Mr. George Bailey, Mr. Sam Millstein and Mr. Paul Alexander, Crisler and the appellee were present, the offer to arbitrate as to the commission was again made by the appellee, when the appellant, George Bailey again asserted that "there won't be any arbitration; there just won't

be any sale." He later added to this statement, "I may be wrong but that is the way it is going to be."

It appears from the testimony of the appellee that the only reason given him by the appellant, Bailey, for his attitude was the embarrassing position that said appellant would be placed in with the Real Estate Board and the Multiple Listing Service for having authorized Millstein to try to sell the property, since he was a non-member of the Multiple Listing Service. At this conference Millstein was making the claim that he was entitled to a part of the commission but as a witness at the trial he conceded in substance that he was not entitled to anything because the sale was never consummated. The appellee testified that: "The only reason I have ever been given to date as to why the sale could not be consmmated was my unwillingness to make a commission agreement with Mr. Sam Millstein."

Following the above-mentioned conference the appellee reported the controversy to the Jackson Real Estate Board and to the Multiple Listing Service, and while the appellant, Bailey, testified that he did not contact the owner, Gibson, at all on Sunday, April 28, 1957, he wrote a letter on May 10 to Mr. W. M. Mann, Chairman, Grievance and Ethics Committee of the Jackson Real Estate Board stating, among other things, that "I contacted Mr. Gibson the same night by telephone and he agreed to withhold this property from the market until Monday morning, and at that time he would give consideration to the offer, * * *." He had already mentioned "Sunday night" in this letter, and therefore in saying that he contacted Mr. Gibson the same night had reference to the Sunday referred to by the appellee in his testimony which shows that Mr. Bailey was mistaken in his testimony at the trial.

The telephone conversation between the appellee and the appellant, Bailey, occurred on Sunday afternoon at about four o'clock, and it appears that Mr. Woodrow

Bailey contacted the attorney for the appellants and for the owner of the property between four and six o'clolk that afternoon and ascertained that the assignment of the insurance policy would be acceptable.

Since Mr. Burgdorff was to leave for Birmingham at four A. M. Monday, and Mrs. Burgdorff was to leave at nine o'clock Monday morning to go elsewhere, the appellee obtained the signatures to the counter offer and to the assignment of the insurance policy before he left the same at the office of the Bailey Lumber Company Monday morning, April 29, and while the appellee was of the opinion that in the light of subsequent developments that the counter offer was never actually delivered to Gibson, the testimony of both Woodrow Bailey and Gibson was to the effect that it was delivered to Gibson during that Monday morning.

At any rate the appellee testified that the appellant, George Bailey, "advised me that the contract could not be signed because of my unwillingness to work out a commission agreement with a man whom I felt had no legal listing of the property;" and further said that "Mr. George Bailey stated in a telephone conversation to me that he would advise Mr. Gibson, the owner of the property, not to sign the contract unless I agreed to get with Millstein and work out a commission agreement, an agreement on commission with Millstein. Q. That is what he told you he had done? A. That is what he told me. Q. Said that he was going to tell Gibson not to sign the contract? A. Yes, sir."

The court interrogated the appellee as follows: "Q. Did Mr. Gibson assign any reason why he would not sign it? A. Judge, the only reason Mr. Gibson gave me was that he had been advised not to sign the contract because he might have to pay two real estate commissions."

Upon further examination of the appellee by his attorney the following testimony was given: "Q. Mr. Richards, throughout the occasion of these negotiations, who

assumed the position of saying whether that house would or would not be sold whenever it was discussed? A. Mr. George Bailey. Q. Did Mr. Bailey at any time tell you that unless you did certain things he would not permit the sale of the house? A. Yes, sir, Mr. George Bailey told me that unless I got with Millstein and worked out the commission agreement - - - Q. Did Mr. George Bailey take the position that unless you would go along with his wishes and split the commission, rather than submit to arbitration that he under no circumstances would permit the sale to go through? A. Yes, sir, he did. * * * Q. Now, throughout these negotiations, Mr. Richards, what was contended constantly, by Mr. Bailey and his attorney, Mr. Alexander, as to Mr. Bailey's getting into trouble with Multiple Listing Service and the Real Estate Board if this thing were submitted to arbitration because he had illegally listed it with Sam Millstein? A. That was their contention, Mr. Crisler, in that it would place Mr. Bailey in a position of embarrassment with the Real Estate Board and the Multiple Listing Service, should this sale be consummated and the commission contention arise between Mr. Millstein and myself. Q. Well, was it not, as a matter of fact, Mr. Bailey, in order to protect himself, refused to let the sale go through unless the split of the commission was resolved? A. Yes, sir. * * * Q. Now, Mr. Richards, at any time throughout this substantially week of negotiations, was there ever, ever an occasion when Mr. Bailey or Mr. Gibson evidenced any dissatisfaction with the price for which this property was to be sold? A. No. sir. Q. Was there ever any dissatisfaction as to the terms and conditions of the contract which you submitted? A. No, sir.''

■ ■ In other words the appellee testified unequivocally that he produced a purchaser who was ready, willing and able to buy on terms acceptable to the owner, except as to the real estate commission division; and the jury was warranted in believing that the appellee had a

reasonable expectation of the contract's being consummated except for the influence and interference of the appellants and Millstein in thwarting the consummation thereof. And the jury was warranted in believing from all the facts and circumstances testified to on behalf of the plaintiff, some of which facts were denied by the defendants, that both the appellants and Millstein knew all the while that the latter was not entitled to any commission. It was for the consideration of the jury that it was not disputed that had Millstein been permitted to share in the real estate commission he would have had to divide in half with the appellants the portion that he received.

The conference at Mr. Crisler's office adjourned without any agreement having been reached for the arbitration of the commission or for the appellee to divide the commission with Millstein.

The result was that the appellee had to notify the Burgorffs of the appellant, Bailey's, attitude, and that the sale would not be allowed to be consummated. On the following Saturday thereafter Mr. Burgdorff telephoned from Birmingham and inquired as to why he couldn't purchase the Gibson house since it was listed for sale and he had made an offer acceptable to the owner; and Burgdorff was thereupon advised by Mr. Bailey, ''Well, the only way we can sell it is for you to get a complete release from Mr. Richards, and then I can sell you the house. Q. Did you ask him about the price? A. I asked him if the price was all right, and he said: 'Yes, I guess so. He was very vague about it.' * * * Q. He was not making any protest about the price, just the commission? A. Well, I don't know what was between them but he made it very plain that I could not get the house, that I could not get possession of the house if I dealt with Mr. Richards. Q. He made it plain to you that if you got a release from Richards you would get the house, he would sell you the house? A. Yes, sir.''

The appellee was very much embarrassed and disturbed over what had occurred and Mr. Burgdorff became angry with the appellee for the failure of the latter's efforts, and mentioned Mrs. Burgdorff's becoming very much upset on account of their plans to purchase the home at that time having been thwarted, but be that as it may, the jury was warranted in finding that the interference by the appellants was wrongful and wanton.

The jury was entitled to take into consideration the fact that this house and lot was soon sold by the owner for $24,500, on which the appellants received the commission, as going to show that it was more than reasonably probable that the owner would have consummated the sale to the Burgdorffs for $25,500 except for the wilful and wanton interference of the appellants.

In this case the negotiations between the appellee and the appellants had their origin on the Sabbath day, and the counter offer of the proposed purchasers was signed on that day, but the same was done pursuant to an agreement, according to the testimony on behalf of the appellee, that the written offer was to be submitted to the owner on the following morning for his approval and signature and which was never given. Nevertheless this is not a suit on a contract but is one for the alleged tort of the defendants in interfering with and preventing the formation of a contract.

 And as stated in 86 C. J. S., Torts, Sec. 43, page 955, Prospective Contracts, Conduct of Business, the "*Wrongful* or malicious interference with the formation of a contract or the right to pursue a lawful business, calling, trade or occupation has been generally held to constitute a tort." (Emphasis ours.) See the remainder of this lengthy section of the text on this question, and compare 30 Am. Jur., Interference, Secs. 38-41, pages 82-84, Preventing making of Contract, and the case of Globe & Rutgers Fire Insurance Co. v. Firemen's Fund Insurance Co., et al, 97 Miss. 148, 52 So. 454, wherein it was

said, among other things: ''The action would lie as well against one as against all the defendants; but the charge of the conspiracy is the basis of the right to join all in the same suit as parties defendant. It becomes, by reason of the conspiracy, the joint wrong of all conspirators.'' (Citing authorities.)

In the case of Jessup v. Reynolds, 208 Miss. 50, 43 So. 2d 753, the action was one for damages for an assault and battery pursuant to a conspiracy. And it is contended by the appellants here that that case does not support the verdict of the jury and the judgment of the trial court in the instant case, for the reason that an assault and battery may be committed by only one of the conspirators. But we think that in the case at bar a conspiracy was established and that it could have been carried out by the appellants with the aid of Millstein, in interposing an unwarranted claim for a commission; that the appellant, George Bailey, was the principal actor in wilfully and wantonly preventing the formation of the proposed contract. Moreover in the Jessup case Justice Hall cited the rule as announced in C. J. S. and Am. Jur. when he stated that ''In 15 C. J. S., Conspiracy, Sec. 31, page 1052, it is said: 'As a general rule, as the gravamen of the action is the damage and not the conspiracy, * * *, a verdict or judgment may be rendered against any one or more of defendants, and in favor of the others, as the rule as laid down in Corpus Juris, which has been quoted and cited with approval, is that if plaintiff fails in the proof of a conspiracy or concerted design, he may still recover damages against one or more of defendants shown to be guilty of the tort without such agreement, and is not entitled to a verdict against defendants whom he does not prove participated in the wrong'. To the same effect is 11 Am. Jur., Conspiracy, Sec. 59, page 588, where it is said: 'Under the now obsolete common-law writ of conspiracy, it was essential that at least two persons be joined and found guilty. Since the gist of

the modern civil action of conspiracy, however, is the damage and not the combination, the authorities sustain the proposition that ordinarily a verdict may be rendered against one of the defendants even though no conspiracy is proved.' The quoted authorities announce the rule which is well recognized throughout this country and it therefore follows that there is no merit in appellant's first contention''.

▮▮ The quotations from the appellee's testimony and from that given by Mr. Burgdorff, which the jury had the right to believe, speak for themselves, and while numerous authorities are cited in the brief of the appellee to sustain the verdict rendered herein for both actual and punitive damages, we do not deem it necessary to either collate or discuss the numerous cases cited in the brief. It is sufficient to say that the facts hereinabove stated, if true, presented a strong case for the imposition for punitive as well as actual damages, and that, therefore, the judgment appealed from should be affirmed.

We have discussed in conference and considered the various assignments of error by the appellants and have concluded that no reversible error was committed upon the trial of this case.

Affirmed.

*Hall, Lee, Holmes,* and *Ethridge, JJ.,* concur.