**WILCON, INC.,**
Plaintiff-Counterdefendant-Appellee
Cross-Appellant,

v.

The **TRAVELERS INDEMNITY COMPANY,** Defendant-Counterclaimant-Appellant Cross-Appellee.

No. 79–2888.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 20, 1981.

Rehearing Denied Oct. 9, 1981.

Jones, Walker, Waechter, Poitevent, Carrere & Denegree, Herschel L. Abbott, Jr., New Orleans, La., Daniel, Coker, Horton, Bell & Dukes, John B. Clark, Jackson, Miss., for defendant-counterclaimant-appellant cross-appellee.

Young, Scanlon & Sessums, Pat H. Scanlon, Jackson, Miss., David L. Reynolds, Jackson, Miss., for plaintiff-counterdefendant-appellee cross-appellant.

Appeals from the United States District Court for the Southern District of Mississippi.

Before WISDOM, COLEMAN and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This diversity case involves the construction of a sewage collection system for the City of Waveland, Mississippi. The litigants are Wilcon, Inc., a construction contractor that worked on the project, and The Travelers Indemnity Co., Inc. (Travelers), the surety that bonded the project. Wilcon brought this suit seeking damages from Travelers for "interference with business relations" and "abuse of process," both of which torts allegedly occurred in connection with the Waveland construction project. Travelers then sought in a counterclaim to recover the cost of completing the project, which it assumed after Wilcon's default. After a trial conducted by a magistrate, the jury found in favor of Wilcon on a general verdict and awarded $100,000 in compensatory damages and $1,500,000 in punitive damages; the jury also found in favor of Travelers on its counterclaim and awarded $1,000,000 in compensatory damages with respect thereto.

Each party now challenges the sufficiency of the evidence to support the judgment entered against it, and Travelers also challenges the sufficiency of the evidence to support the purportedly inadequate amount awarded on its counterclaim. We find that the evidence is insufficient to support the jury's verdict in favor of Wilcon, and we therefore reverse that portion of the district court's judgment entered pursuant thereto. We find that the evidence is sufficient to support the jury's verdict on Travelers' counterclaim, both as to liability and as to the amount, and we therefore affirm that portion of the judgment entered pursuant thereto.

## I. THE FACTS

Wilcon, a Louisiana corporation, was from 1969 (its formation) to 1974 (the time of the events in question) a contractor specializing in underground construction; during this period Wilcon procured a number of payment and performance bonds (totalling approximately $7,500,000) from Travelers. Wilcon was and still is controlled by R. E. Wilson, its president and chief stockholder.

Howard L. Byrd, Contractor Building Services, Inc. (the Byrd Corporation) is a Mississippi corporation which at the time of these events was a contractor doing substantial underground construction work. The Byrd Corporation was and still is controlled by Howard L. Byrd, its president and chief stockholder.

In early 1972, Wilcon and the Byrd Corporation agreed to bid together on the con-

struction of a proposed sewage collection system in Waveland, Mississippi. Although the details of their initial decision to consider a joint bid are in dispute, both parties agree that Joe Ashley, the manager of Travelers' New Orleans office, played some role in the initiation of this relationship.

In July 1972, the City of Waveland awarded the construction job to Wilcon and the Byrd Corporation, whose joint offer was found by the Mayor and Board of Aldermen of Waveland to be the lowest and best bid. In August 1972, Travelers wrote both a payment and a performance bond on this project; each bond was issued to the City of Waveland in the amount of $2,284,041.30—the contract price of the successful bid.

Work began on the project in September 1972, with the Byrd Corporation responsible for construction on the east side of Waveland and Wilcon responsible for the west side of the town; Wilcon did not itself begin the job, but instead subcontracted its entire portion to Ray Gray Construction Co. (Gray), a sole proprietorship. The Byrd Corporation and Gray worked together until June 1973, when the Byrd Corporation announced that it was financially unable to complete its portion of the project or to pay its outstanding bills. Wilcon thereupon decided to assume the entire project, and hired Gray to complete the Byrd Corporation's portion as well as its own. Gray continued work until June 1974, at which point he notified Wilcon that he too was financially unable to complete the project or to pay his outstanding bills. Wilcon then commenced construction on its own, but Wilcon itself ceased work in early 1975. In March of that year, the City of Waveland terminated its contract and called upon Travelers to complete the project in accord-

ance with its performance bond. Travelers immediately demanded performance or indemnity from Wilcon, but Wilcon refused. In April 1975 Travelers hired Wallace Industrial Constructors of Mississippi, Inc. to complete the Waveland project; this was done at a cost to Travelers (including attorneys fees and other expenses) of $1,551,976.86.

Wilcon's refusal to indemnify Travelers stems in large part from a dispute with Travelers over the form of business organization used by Wilcon and the Byrd Corporation with respect to their work on the Waveland project. Travelers contends that the two original contractors operated as a joint venture. Travelers relies for this assumption on a variety of relevant documents that read in terms of a "joint venture;" on some testimonial evidence that indicates that the parties treated the arrangement as a joint venture; and on the fact that only Wilcon and the Byrd Corporation—not any separate entity formed by the two contractors—complied with state contractor certification requirements. Travelers argues that as a joint venturer Wilcon is liable under a general indemnity agreement signed by Wilcon in 1970; that agreement by its own terms is applicable to all bonds issued on projects contracted by Wilcon as sole principal or as joint venturer.[1]

However, Wilcon contends that the contract with the City of Waveland was held not by Wilcon and the Byrd Corporation as joint venturers, but instead by a separate corporation formed on June 1, 1972 for the sole purpose of bidding and completing the Waveland project. This new corporation was given the confusing name of "Howard L. Byrd, Contractor Building Services and

1. The relevant provision of the general indemnity agreement signed by Wilcon in 1970 reads as follows (emphasis in original):

THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY APPLICATION SIGNED BY ANY ONE OR MORE OF THE INDEMNITORS—SUCH APPLICATION TO BE CONSIDERED BETWEEN THE PARTIES HERETO AS MERE-

LY SUPPLEMENTARY TO THIS GENERAL AGREEMENT OF INDEMNITY) MAY BE EXECUTED BY THE COMPANY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT OR CO-ADVENTURER), FROM TIME TO TIME, AND OVER AN INDEFINITE PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELED IN ACCORDANCE WITH THE TERMS HEREOF.

Wilcon, Inc." (hereinafter the "Combined Corporation"). The Combined Corporation was originally owned in equal shares by Byrd and Wilson, but upon his default Byrd tendered all of his shares to Wilson. Wilcon argues that the Combined Corporation held the construction contract with the City of Waveland and subcontracted equal portions of the Waveland project to Wilcon and the Byrd Corporation. In circumstances like this—where contractors form a new corporation to bid and complete a single project, and then subcontract the project to themselves—Travelers ordinarily requires the execution by the "subcontractors" of a special indemnity agreement by which they became directly responsible to Travelers. In this case, however, Travelers failed to require the execution by Wilcon and the Byrd Corporation of such an agreement; accordingly, Wilcon has argued since its default that it has no indemnity obligation to Travelers on the Waveland project.

Travelers contends that Wilcon is liable for the completion of the Waveland project even if one assumes *arguendo* the validity of the Combined Corporation and its subcontracts to Wilcon and the Byrd Corporation. This contention rests on two separate theories, each of which rests in turn on disputed facts. First, Travelers argues that the Combined Corporation acted only as *agent* for its two purported subcontractors; according to this theory, Wilcon is a principal to the contract and therefore liable under the general indemnity agreement just as if the Combined Corporation had never been formed. Second, Travelers argues

that by completing the Waveland project it became *subrogated* to the claims of the Combined Corporation against its own subcontractors, which of course include Wilcon. According to this theory, Travelers assumed the Combined Corporations' causes of action both for breach of contract (Wilcon breached its contract when it ceased work on the project)[2] and for contractual indemnity (Wilcon's subcontract indemnifies the Combined Corporation against negligence and guarantees against defects).[3] This final theory—subrogation—is treated in more detail in Part IIIA of this opinion.

Wilcon's cause of action against Travelers rests on two further areas of disputed fact. In the first place, Wilcon contends that Travelers' agents engaged in a course of conduct after Wilcon's default that prevented Wilcon from procuring payment and performance bonds from any other company. According to Wilcon, this conduct consisted of a series of conversations between certain agents of Travelers and the representatives of various bonding agencies and companies; these conversations concerned Wilcon's default on the Waveland project and Travelers' difficulty in dealing with Wilcon thereafter. Wilcon contends that Travelers' agents convinced the other agencies and companies not to bond any project for Wilcon, and that as a result of its inability to procure bonding Wilcon was forced out of business. On the basis of these assertions (most of which are disputed by Travelers), Wilcon sought compensatory and punitive damages under Mississippi law for "wrongful or malicious interference with business

---

**2.** Travelers argues that Wilcon is responsible for the entire Waveland project, not just the portion originally subcontracted to it by the Combined Corporation; this liability follows from the Byrd Corporation's assignment (and Wilcon's acceptance) of the Byrd Corporation's subcontract, as evidenced in the minutes of the July 20, 1973 meeting of the Combined Corporation.

**3.** Wilcon's subcontract with the Combined Corporation reads in pertinent part as follows:

INDEMNITY. Subcontractor agrees to indemnify and defend Contractor from all claims based on the negligence of the Subcontractor.

. . . .

GUARANTY. In addition to any guaranty contained in Contractor's contract with its customer, Subcontractor guarantees all work done hereunder to the extent that it will repair any defects caused by defective design, materials or workmanship furnished by Subcontractor which may appear within one year from final acceptance by the customer of the work described herein provided written notice thereof is given to Subcontractor during that year or within thirty days thereafter.

relations." The facts behind this claim are treated in more detail in Part IIA of this opinion.

In the second place, Wilcon seeks damages on the basis of a writ of attachment which Travelers procured with respect to a separate and unrelated project undertaken by Wilcon and bonded by Travelers. Certain facts are undisputed: at the time of Wilcon's default at the Waveland project, Wilcon was completing another construction project for the town of Prentiss, Mississippi, and that project was also bonded by Travelers; Prentiss owed Wilcon approximately $160,000 on that project; in October 1975, Travelers filed suit to attach these funds in the United States District Court for the Southern District of Mississippi, and the attachment was immediately issued; in May 1976, the attachment suit was consolidated with the action now before us; and in December 1977, the attachment was vacated as the result of another decision holding the Mississippi attachment statute unconstitutional. Wilcon contends that this attachment strangled its credit and destroyed its business, and further contends that Travelers' request for the writ was made with the ulterior motive of injuring Wilcon and was thus an "abuse of process" under Mississippi law. Travelers argues, on the other hand, that it sought an attachment not to damage or destroy Wilcon, but to protect its ability to collect a judgment in the instant suit. This "abuse of process" theory is treated in more detail in Part IIB of this opinion.

## II. WILCON'S JUDGMENT AGAINST TRAVELERS

Travelers contends on appeal that the evidence offered by Wilcon was insufficient to support a jury verdict on the basis of

either "interference with business relations" or "abuse of process;" accordingly, Travelers argues that the district court should have granted one of its motions for a directed verdict or for judgment notwithstanding the verdict.[4] We agree. Reading all of the evidence in the light most favorable to Wilcon, we must conclude that no reasonable finder of facts could have found against Travelers on either theory advanced by Wilcon. See Boeing Co. v. Shipman, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc).

### A. Interference with Business Relations

■ Wilcon does not contend that Travelers interfered with any existing contract to provide bonding to Wilcon; instead, Wilcon contends that Travelers prevented it from procuring any new bonding contract, i. e., that Travelers interfered with Wilcon's prospective business relations. It is elementary that to establish a tortious interference with prospective business relations the plaintiff must demonstrate that absent the interference those relations were reasonably likely to develop in fact—in this case, that a bonding contract probably would have been procured. See Bailey v. Richards, 236 Miss. 523, 111 So.2d 402, 406–07 (1959); Johnson v. Warnaco, Inc., 426 F.Supp. 44, 47 (S.D.Miss.1976); Martin v. Texaco, Inc., 304 F.Supp. 498, 502 (S.D.Miss. 1969). This proposition follows from the ancient tort concept of proximate cause: since Wilcon seeks to recover for the damages caused by its failure to procure bonding, Wilcon must demonstrate that such failure was proximately caused by the alleged tortious conduct. See generally W. Prosser, Torts § 41 (1971). Thus, the judge properly instructed the jury that they could grant a judgment to Wilcon on the basis of

4. Travelers raises a number of other arguments as well. Aside from its general challenges to the sufficiency of the evidence to support the verdict, Travelers argues that the evidence is insufficient to support either punitive damages or the jury's determination of compensatory damages. Travelers also challenges the district court's refusal to grant a new trial either in response to certain alleged jury misconduct or in response to certain new evidence discovered after trial. Since we find the evidence insuffi-

cient to support the verdict, we need not reach any other claim, and we accordingly express no opinion with respect thereto.

We also note that each of Wilcon's two tort theories is arguably unsupported by the evidence as to elements other than those we focus on in our discussion; however, since we find that a necessary element of each tort is unsupported by the evidence, we need not consider any other element, and we accordingly express no opinion with respect thereto.

Travelers' interference with Wilcon's attempts to obtain surety bonds only if they found "that as the proximate result thereof Wilcon was unable to obtain surety bonds." Transcript at 1833.[5] Our review of the evidence convinces us that no reasonable finder of facts could have found this essential element of an "interference with business relations" cause of action; we therefore restrict our discussion to proximate cause and express no opinion on the sufficiency of the evidence as to other elements of the tort.

Read in the light most favorable to Wilcon, the record demonstrates the following evidence on the issue of proximate cause: Wilcon unsuccessfully sought to procure payment and performance bonds from a number of agencies and companies other than Travelers. These include the G. A. Talbert Agency (Talbert Agency), and Allen-Hickman-Jones Agency (A–H–J Agency), Safeco, Fireman's Fund, Fidelity and Deposit of Maryland (F&D), and CNA Insurance Co. (CNA). In each case the refusal to bond Wilcon followed some communication from Travelers; these communications each involved either Joe Ashley, the Travelers' manager who had been instrumental in bringing together Wilcon and the Byrd Corporation, or Steve Vassil, the assistant manager of Travelers' New Orleans office. In each case the communication included some indication of Wilcon's default on the Waveland project and of Travelers' difficulties in dealing with Wilcon. Talbert Agency was told that Wilcon was responsible to Travelers for its loss at Waveland; A–H–J Agency was told that Wilcon would not complete its work at Waveland; and Safeco, Fireman's Fund, and F&D were each told that Travelers would no longer write bonds for Wilcon. In several cases, moreover, the bonding agency or company explicitly based its refusal to bond Wilcon at least in part on Wilcon's difficulties with Travelers over the Waveland project. Talbert Agency explained in a letter to Wilcon that its previous interest in representing

Wilcon had been premised on Wilson's feeling that the Waveland project would be completed, at a profit, by early 1975, and further noted its understanding that Wilcon had since developed problems on the job, including substantial differences of opinion with Travelers. Similarly, an agent at A–H–J Agency told Wilson that he could not handle Wilcon's account if the Waveland project "was going to Travelers' claim department." Finally, CNA explained in a letter to an agent representing Wilcon that "the major problem" preventing any deal with Wilcon was "the misunderstanding and continued involvement on the Waveland project." CNA expressed some interest in later providing bonding to Wilcon, but only upon Wilcon's completion of the Waveland project and a release by the surety of all obligations related thereto.

This evidence, taken together, indicates that Travelers' communications bore some relevance to the various agencies' and companies' refusals to deal with Wilcon, for such refusals were in large part based on Wilcon's default at Waveland and its difficulties with Travelers, and Travelers' communications all involved this subject to some degree. But Wilcon must prove more than some incidental relationship between Travelers' actions and Wilcon's inability to procure bonding; as explained above, Wilcon must demonstrate that the former is the *proximate cause* of the latter.

In determining whether a reasonable trier of fact could have found such cause, we must of course "consider all of the evidence—not just that evidence which supports [Wilcon's] case." *Boeing Co. v. Shipman, supra,* at 374. In considering all of the evidence, we find two related facts to be decisive. First, the content of Ashley's and Vassil's communications were relatively limited. At most, they explained that Wilcon had failed to complete the Waveland project and had refused to indemnify Travelers—both of which statements were en-

5. The district court defined "proximate cause" in its instructions as "that cause which in a natural and continuous sequence, unbroken by any efficient intervening cause, produce[d] the result complained of." Transcript at 1834.

tirely correct.[6] Second, Wilcon has pointed to no evidence in the record (and we have found none) which in any way suggests that absent Travelers' communications the other bonding agencies and companies would not have discovered the substance of these limited communications. We are not surprised at the absence of such evidence; indeed, it strains the imagination to assume, as Wilcon's case requires, that a bonding agency or company would not inquire into a contractor's recent dealings with other bonding businesses. In fact, the record in this case suggests that the agencies and companies to which Wilcon turned were keenly interested in its previous history *before* they discussed the matter with Travelers: Safeco, Fireman's Fund, and F&D each *initiated* the communication with Travelers. At bottom, Wilcon's case is premised on the assumption that had Travelers' agents refused to say anything, these bonding companies would not themselves have found out about Wilcon's difficulties at Waveland—an assumption which is reasonable only if we further assume that the companies would not have asked Wilcon about its previous record with Travelers, or that Wilcon could successfully have hidden the truth in response thereto.

■ Wilcon's real problem was not the few brief communications between Travelers and other bonding companies, but was instead its default at Waveland and its refusal to indemnify Travelers. The reason expressed by those agencies and companies that explained their refusal to bond Wilcon (Talbert Agency, A–H–J Agency, and

CNA) in each case centered around Wilcon's difficulties at Waveland; in no case did a bonding agency or company refer to any communication with Travelers. The crucial facts—Wilcon's default and subsequent refusal to indemnify its surety—would not likely have disappeared in the absence of Travelers' communications with other bonding agencies and companies, but would in all probability merely have surfaced from a different source. We conclude therefore that no reasonable finder of facts could have found Travelers' alleged "interference with business relations" to have been the proximate cause of Wilcon's damages. Accordingly, that theory cannot support the jury's verdict against Travelers.

### B. Abuse of Process

■ The trial judge correctly instructed the jury on the elements of an abuse of process under Mississippi law. The judge explained that Wilcon was entitled to recover on this theory only if it could demonstrate (1) that Travelers' attachment of funds due Wilcon on the Prentiss project was used in a manner not contemplated by law or for a purpose which the procedure was not intended by law to effect; (2) that Travelers had an improper ulterior purpose or motive for using the attachment proceedings; and (3) that Travelers' improper use of attachment proceedings was a proximate cause of Wilcon's damages. Transcript at 1834. *See, e. g., State ex rel. Richardson v. Edgeworth*, 214 So.2d 579, 586 (Miss.1968);

---

**6.** The record evidence as to the content of these communications is as follows: (1) Robert L. Larrowe, a Vice President of Talbert Agency, testified that Ashley had told him "his side of the story" in September 1974; according to Larrowe, Ashley discussed the problems at Waveland, explained that Wilcon was responsible for the project, and said that Travelers would no longer write bonds for Wilcon. (2) Richard E. Findley, an agent at A–H–J Agency, testified with respect to a conversation initiated by Ashley in February 1975; according to Findley, Ashley told him that he had just been advised by Wilson that Wilson could not complete the project at Waveland since "the company he had formed to do the Mississippi job was out of money." (3) Vassil testified as to Ashley's conversations (to which Vassil was

also a party) with representatives of Safeco, Fireman's Fund, and F&D; according to Vassil, in each case Ashley and Vassil indicated their confidence in Wilson's abilities, and simply stated that they were not at that time writing bonds for Wilcon. Vassil testified that they made no further comments and, in fact, that they did not specifically mention the Waveland project. (4) Ashley testified that he initiated no conversations regarding Wilcon with any company other than A–H–J Agency. As to those companies that contacted Travelers, Ashley testified that he informed the callers only that by mutual agreement Travelers no longer had a business relationship with Wilcon; Ashley also testified that in each case he told the caller that Travelers had nothing derogatory to say about Wilcon.

984

*Hyde Construction Co. v. Koehring Co.*, 387 F.Supp. 702, 712–14 (S.D.Miss.1974), *affirmed sub nom. Dunn v. Koerhing Co.*, 546 F.2d 1193, 1199 (5th Cir. 1977). Our review of the evidence convinces us that no reasonable finder of facts could have found the first element of an "abuse of process" cause of action; thus, although our discussion of the law necessarily involves the second element as well, our discussion of the sufficiency of the evidence is limited to the first.

■ At the outset we must be careful to distinguish between the first two elements of an abuse of process. These distinct elements are sometimes confused, for both rely on some notion of the "purpose" with which the defendant's action was taken. The first element pertains to the *immediate purpose* to the defendant's use of process. The inquiry as to this element is whether the procedure at issue was used not to enforce some legal remedy that the process was designed to afford, but was instead used to force the plaintiff "to do some collateral thing which he could not legally and regularly be compelled to do." 1 Am. Jur.2d *Abuse of Process* § 4, at 253. As Prosser explains:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

W. Prosser, *supra*, at 857. Of course, it follows from this analysis that the defendant is not protected merely because his use of process incidentally resulted in some legitimate remedy contemplated by the statute; the plaintiff need show only that the defendant acted "primarily" to accomplish an immediate purpose for which the process was not designed. *See* Restatement (Second) of Torts § 682 (1977).

■ The second element pertains to the *ultimate motive* behind the defendant's use of the process. In order to establish this element, the plaintiff must demonstrate that the defendant acted out of an ulterior motive that was improper or malicious. The plaintiff must show, for example, that the defendant acted out of spite or hate, or to procure some unfair advantage. *See* 1 Am.Jur.2d *Abuse of Process* § 4, at 252.

■ The second element is ordinarily inferred from the first, for one will rarely find a "proper motivation" behind a defendant's use of process for an improper collateral purpose. The reverse, however, is not true. *See* W. Prosser, *supra*, at 858; 1 Am.Jur.2d *Abuse of Process* § 4, at 253. Regardless of the defendant's motivation and no matter how malicious his intent, the plaintiff must still show that the defendant did not use the process at issue primarily to effectuate the remedy contemplated by the statute. As the Restatement (Second) of Torts explains:

> [T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. Thus the entirely justified prosecution of another on a criminal charge, does not become abuse of process merely because the instigator dislikes the accused and enjoys doing him harm; nor does the instigation of justified bankruptcy proceedings become abuse of process merely because the instigator hopes to derive benefit from the closing down of the business of a competitor.

Restatement (Second) of Torts § 682, Comment b (1977).

In order to determine whether Travelers acted primarily to assert a legal remedy that the process at issue was designed to afford, we must first determine the immediate purpose contemplated by the statute that provides for that process. Travelers' suit for an attachment was based on the "attachment in chancery" provisions of the Mississippi Code, 11 Miss.Code Ann. § 11–31–1 *et seq.* (1972). These provisions provide for attachment in suits which are

based upon demands founded upon any indebtedness, whether the same be legal or equitable, or for the recovery of damages for the breach of any contract, express or implied, or arising ex delicto against any nonresident, absent or absconding debtor, who has lands and tenements within this state, or against any such debtor and persons in this state who have in their hands effects of, or are indebted to, such nonresident, absent or absconding debtor.

11 Miss.Code Ann. § 11–31–1.

Since Wilcon (a Louisiana corporation) is a nonresident of Mississippi, attachment under these provisions may properly have been issued, *inter alia,* to protect Travelers' right "for the recovery of damages for the breach of any contract, express or implied." This immediate purpose is clearly stated in Travelers' original complaint in the attachment action. The basis for the attachment as asserted in that document was Wilcon's purported indebtedness to Travelers for Wilcon's default on the Waveland project.[7] In particular, Travelers contended that Wilcon was liable by virtue of the parties' general agreement of indemnity for all sums expended by Travelers in connection with its Waveland bond obligations; although the Waveland project had not yet been completed, Travelers estimated this amount at over $800,000, of which $360,000 had already been expended by Travelers.[8]

■ In order to establish the first element of an abuse of process, Wilcon must demonstrate that the primary purpose to Travelers' attachment of its funds was not the purpose expressed in its attachment complaint (*i. e.,* the protection of Travelers' ability to collect a judgment based on its contractual right of indemnity), but was instead some other objective not contemplated by the statute. Whether Travelers acted maliciously or in bad faith is immaterial to this inquiry; the decisive question is whether Travelers' primary objection in seeking this attachment was some collateral action on Wilcon's part to which Travelers would not otherwise have been entitled. Wilcon might have established this element by showing, for example, that Travelers sought not primarily to protect its ability to collect on its indemnity claim, but sought instead to force a quick settlement of Wilcon's claim for "interference with business relations." If such were the case Travelers could be said to have used the attachment to extort a settlement on an unrelated claim—a purpose which clearly is not envisioned in the attachment statute.

Wilcon points to a number of related facts in support of its abuse of process claim: the attachment suit was originally filed in a division of the Southern District of Mississippi other than that in which this suit was brought; Travelers gave Wilcon no notice of the attachment suit, despite the pendency of the action now before us; the attachment tied up approximately $160,000 in funds and seriously harmed Wilcon's ability to procure financial credit; Travelers was slow to release funds from the attachment which were owed to subcontractors and materialmen at Prentiss; and Travelers' use of this attachment statute occurred despite obvious constitutional infirmities in the statute.[9] These facts arguably demon-

---

7. Wilcon states on appeal that Travelers' purported basis for the attachment was "the protection of Prentiss creditors." The attachment complaint does indeed refer to such creditors, and offers to release the attachment to pay their claims. However, the complaint explicitly sets forth Wilcon's purported indebtedness on the Waveland project, and clearly relies on such indebtedness as the basis for its rights under the Mississippi attachment statute.

8. The theory advanced by Travelers in its attachment complaint (which relies on the general indemnity agreement) is of course different from that which we rely upon (subrogation) to support the jury's verdict. However, we perceive no importance in this distinction. Although we do not reach the validity of the theory originally relied upon by Travelers, that theory is certainly sufficient to support Travelers' legitimate use of the attachment statute.

9. The district court vacated Travelers' attachment in December 1977 upon its conclusion that the statute (which has since been revised) was unconstitutional. Wilcon contends that it was entitled to an instruction—which the court denied—that the jury consider whether Travelers knew or should have known that the attachment statute was unconstitutional or

strate some malicious intent on Travelers' part, and they may indeed be taken to demonstrate that the protection of Travelers' rights in indemnity was not the *sole* purpose of Travelers' institution of attachment proceedings. But this leaves us a long way from the proposition required by the first element of an abuse of process claim, *i. e.*, that Travelers' *primary purpose* in seeking an attachment was something other than the protection of its contractual indemnity claim. Indeed, the record strongly supports Travelers' legitimate interest in the attachment of Wilcon's funds: Travelers' assertion of its indemnity claim against Wilcon was clearly a serious one (as evidenced by the favorable jury verdict on its counterclaim); its claim was substantial (resulting in a $1,000,000 jury verdict); and, as Wilcon has repeatedly stated, Wilcon had few if any assets apart from the fund attached. Thus, Travelers' attachment was not only based on a complaint which on its face stated a legitimate purpose, but was also undertaken in circumstances which render that stated purpose quite plausible.

In the context of the legitimate purpose expressed in Travelers' complaint and of the circumstances surrounding that complaint, Wilcon had a difficult burden if it was to prove that Travelers' primary purpose was something other than that contemplated by the statute. Our examination of the record convinces us, however, that Wilcon did little if anything to meet this burden. Wilcon has pointed to no evidence which negates the seriousness of Travelers' obvious and clearly stated purpose of protecting its substantial claim in indemnity, and we have found none. We must conclude, therefore, that no reasonable finder of facts could have found the first element of an abuse of process on the evidence submitted in this case. Since we have already held that the jury's verdict cannot be supported by Wilcon's "interference with business relations" theory, we must reverse the judgment of the district court awarding

Wilcon a total of $1,600,000 in damages on these two causes of action.

## III. TRAVELERS' JUDGMENT AGAINST WILCON

Travelers' counterclaim sought recovery from Wilcon for the full amount expended by Travelers pursuant to its bond obligations on the Waveland project. The jury found in Travelers' favor on this claim and set the damages at $1,000,000. In this appeal Wilcon and Travelers each argue that the jury's verdict was unsupported by the evidence. Wilcon challenges the finding of liability and Travelers challenges the amount of damages, which Travelers asserts was inadequate; each party argues that one of its motions for a directed verdict or for judgment notwithstanding the verdict should have been granted. We uphold both the judgment and the amount of damages.

### A. WILCON'S LIABILITY

As discussed in Part I of this opinion, Travelers' counterclaim rests on three independent theories: (1) Wilcon is liable as a joint venturer under the general indemnity agreement; (2) the Contractor Corporation having acted only as agent, Wilcon is liable as a principal under the general indemnity agreement; and (3) Travelers having become subrogated to the Combined Corporation's rights, Wilcon is liable for breach of its subcontract and for contractual indemnity. However, each one of these theories is—if supported by sufficient evidence—an adequate basis for the jury's verdict; accordingly, we need not consider all three if any one of them is supported by the evidence. Having reviewed the record in the light most favorable to Travelers, we conclude that the evidence was sufficient to support a finding of subrogation, and we therefore restrict our discussion to that theory.

whether Travelers acted with malicious intent to cause a deprivation of constitutional rights. This contention is frivolous. The authority relied upon by Wilcon pertains to civil rights

suits brought under 42 U.S.C. § 1983; such suits are brought against state officials for actions taken under color of state law. This is obviously not such a lawsuit.

When Travelers completed the Waveland project upon the default of the Combined Corporation and pursuant to its bond obligations, Travelers became subrogated to all of the rights and remedies of the Combined Corporation against defaulting subcontractors. *See, e. g., American National Insurance Co. v. United States Fidelity & Guaranty Co.*, 215 So.2d 245, 250 (Miss.1968). Wilcon does not dispute this legal conclusion, but argues instead that the Combined Corporation had no rights against Wilcon. If that is so, Travelers cannot benefit from subrogation, for that doctrine affords Travelers no greater rights than those of the Combined Corporation, whose legal position it is taking. *See, e. g., Anderson v. Anderson*, 100 So.2d 852 (Miss. 1958).

Wilcon contends that it was released by the Combined Corporation for all liability on the Waveland project. This release is evidenced in the record by two letters; each one was written on August 2, 1974, by Wilson, who at that time was the majority stockholder in both Wilcon and the Combined Corporation. The first letter is signed by Wilson in his capacity as president of Wilcon and is addressed to the Combined Corporation. It reads as follows:

> This will confirm our mutual understanding that our company has no further obligation under the subcontract on the above captioned project. We feel that release of liability has been made of our company because of breach of contract in the matter of not having received progress payments in a timely manner. As you know this has precipitated the loss of our subcontractor on this project.
>
> Thank you for your attention in this matter.

The second letter is signed by Wilson in his capacity as president of the Combined Corporation and is addressed to Wilcon. It reads as follows:

> We acknowledge receipt of your letter dated August 2, 1974, and agree that you have no further subcontractual liability on the above captioned project.

> Thank you for your attention to this matter.

At the time these letters were written, Wilcon's subcontractor (Gray) had already defaulted and, according to Wilcon, this had precipitated the refusal of the city to make progress payments. Wilcon argues that the Combined Corporation was thus forced to breach its contract with Wilcon, and that the Combined Corporation's release of Wilcon was made in consideration of Wilcon's release of its claims against the Combined Corporation for breach of contract.

Travelers does not dispute the existence of this release or the sufficiency of consideration given therefor, but argues instead that the jury might properly have found that it is invalid because it was not given "properly and in good faith," as required by the judge's instructions to the jury. Transcript at 1843.[10] We agree. The evidence presented to the jury was more than sufficient to support a finding that the Combined Corporation did not "properly and in good faith" release Wilcon from its obligations. Briefly, the evidence demonstrates the following: (1) Wilson was the president and major stockholder in both Wilcon and the Combined Corporation; (2) the Combined Corporation had few if any assets; and (3) at the time of the release both the Byrd Corporation and Gray had already defaulted. On these facts the jury might reasonably have concluded that the mutual releases executed by Wilcon and the Combined Corporation were not given in a good-faith, arms-length business transaction, but were instead given in a bad-faith attempt to preclude Travelers from recovering as subrogee to the Combined Corporation's contractual rights.

To be sure, Wilcon notes some facts which point in the other direction. At the time of the releases, Wilcon had assumed Gray's unfinished work and had not yet itself defaulted; thus, Travelers had not yet been called upon to complete the Waveland project, and in fact had not yet admitted its

---

10. Wilcon does not dispute the propriety of this instruction. We therefore need not examine the basis for it in Mississippi law, and we express no opinion with respect thereto.

liability. Still, however, we cannot conclude that no reasonable trier of fact could have found the release to be improper or in bad faith. Although Wilcon had not yet itself defaulted, both its original partner (the Byrd Corporation) and its own subcontractor (Gray) had failed to meet their obligations at Waveland. And while Travelers had not yet assumed the job or admitted its liability, Travelers was indeed the provider of performance and payment bonds on the Waveland project. Surely the jury was entitled to conclude (1) that Wilson executed releases between his two corporations only to prevent Travelers from later successfully seeking indemnity from the only corporation which had any remaining assets, and (2) that because of this objective Wilcon was not released from its obligations "properly and in good faith." We conclude, therefore, that the evidence as to Travelers' subrogation theory is sufficient to support the jury's verdict in its favor.

## B. THE AMOUNT OF DAMAGES

Travelers appeals the district court's denial of its motion for judgment notwithstanding the verdict for "the full amount of its losses." Specifically, Travelers points to a stipulation in the record by which the parties agreed that Travelers had expended a total of $1,551,976.86 pursuant to its bond obligations at Waveland, Transcript at 1314, and argues that judgment should have been awarded for that entire amount.

■■■ The stipulation relied upon by Travelers did not, however, extend to the reasonableness of such costs. This does not mean that the stipulation was inadmissible because of Travelers' failure to introduce testimony as to reasonableness simultaneously therewith. Although evidence of expenses ordinarily must be accompanied by competent evidence of reasonableness, the failure of the defendant to object (as Wilcon failed in this case) waives such necessity. *See Pelican Trucking Co. v. Rossetti,* 251 Miss. 37, 170 So.2d 573 (1965). However, the fact that the parties did not stipulate to the reasonableness of Travelers' costs does mean that the reasonableness of those costs was (assuming a conflict in evidence later introduced on the issue) a fact question for the jury, and in this case the judge properly instructed the jury with respect thereto. Transcript at 1841.[11]

■■■ At a later point in the trial, Travelers did introduce some evidence on the reasonableness of its expenses, but this evidence is extremely weak and arguably incompetent. It consists entirely of a brief statement in the testimony of Joe Ashley the manager of Travelers' New Orleans' office. Transcript at 1401–02. Ashley testified that the costs "were very reasonable," but did not explain either the basis for his conclusion or his qualifications to make such an evaluation.[12] To be sure, the evidence introduced by Wilcon is similarly weak: its sole evidence on this point was the testimony of Gray, Wilcon's subcontractor at Waveland, who stated without explanation that it should have cost no more than $200,-000 to complete the job after his default. Transcript at 1659. Taken together, however, the jury was left with an evidentiary conflict on a necessary element of Travel-

---

11. Travelers argues that the record contains no evidence to support the judge's charge to the jury that Travelers could not collect under the general indemnity agreement for payments made *voluntarily*; according to Travelers, it was at all times obligated to complete the Waveland project by virtue of the performance bond it had issued thereon. However, Travelers does not dispute evidence introduced at trial to the effect that Travelers had a potential defense to its bond obligations by virtue of the name discrepancy on the bonds (which were issued to Wilcon and the Byrd Corporation, not to the Combined Corporation). Travelers did not assert this defense, but neither does it argue that it was precluded from doing so.

12. As explanation for its failure to provide more significant evidence of the reasonableness of its costs, Travelers refers to a provision in the general indemnity agreement signed by Wilcon; by that provision, Wilcon agreed to accept a voucher or other evidence of Travelers' costs as "prima facia evidence of the propriety thereof." As we have already decided, however, the jury was entitled to find in favor of Travelers on the basis of Travelers' subrogation to the rights of the Combined Corporation; the rights acquired thereby derive from Wilcon's subcontract with the Combined Corporation, not from the general indemnity agreement.

ers' claim. Although the evidence introduced by both parties is weak, it is sufficient to support the jury's determination of the amount of damages.

## IV. CONCLUSION

We reverse the judgment entered against Travelers on Wilcon's "interference with business relations" and "abuse of process" claims. We affirm the judgment entered against Wilcon on Travelers' counterclaim for the costs of completing the Waveland project. We leave standing the district court's judgment on the two smaller claims which were not appealed: Travelers' judgment against Wilcon for $7,598.55 (an overpayment to Wilcon in connection with the Prentiss project), and Wilcon's judgment against Travelers for $27,918.34 (for the rental of certain equipment in connection with the Waveland project). Therefore judgment shall issue in this suit as follows: for Wilcon against Travelers in the amount of $27,918.34, and for Travelers against Wilcon in the amount of $1,007,598.55. Each party shall bear its own costs.

REVERSED and RENDERED.